Filed 8/26/20  P. v. Vasquez CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>YVETTE VASQUEZ,<br><br>    Defendant and Appellant. | B298378<br><br>(Los Angeles County<br>Super. Ct. No. NA105346) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Meyer, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Steven Schorr, under appointment by the Court of Appeal, for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, David E. Madeo, Acting Supervising Deputy Attorney General, and Idan Ivri, Deputy Attorney General, for Plaintiff and Respondent.

A jury convicted Joseph Salinas (Salinas) and appellant Yvette Vasquez (Vasquez) of the April 23, 2016, first degree murder of Juan Zamora (Zamora).  Each defendant was also convicted of possession of a firearm by a felon.  Appellant was sentenced to a term of imprisonment of 75 years to life.  She appeals, contending the evidence is not sufficient to support the judgment.  We affirm in part, reverse in part, and remand.

**STATEMENT OF THE CASE**

Salinas and appellant were charged with murder (Pen. Code,[1] § 187, subd. (a))  and possession of a firearm by a felon. (§ 29800, subd. (a)(1).)  As to the murder count, the information alleged a principal discharged a firearm during the offense, causing great bodily injury and death.  (§ 12022.53, subds. (d) and (e)(1).)  It was also alleged as to both defendants that the crimes were committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(B).)  Lastly, it was alleged appellant had been convicted of a prior serious or violent felony.  (§§ 667, subd. (d) and 1170.12, subd. (b).)

Appellant was found guilty as charged.  The court found the prior felony conviction allegation to be true and declined to strike it.  The court doubled the 25 years to life sentence on the murder count under the Three Strikes law and added 25 years to life based on the firearm enhancement.  The court imposed a concurrent term of 10 years on the possession count, which

---

[1]     All undesignated statutory references are to the Penal Code.

included four years for the gang enhancement. Vasquez filed a timely appeal from the judgment.[2]

Vasquez contends there is insufficient evidence that she was the driver of the vehicle that transported Salinas to the scene of the murder. She also contends there is insufficient evidence she knew of Salinas's intent to murder Zamora. For the possession of a firearm charge, Vasquez asserts she did not control, constructively or otherwise, the firearm Salinas used to shoot Zamora.

As to the murder count, the record includes substantial evidence demonstrating both that Vasquez was the driver and that she knowingly participated in the planning and execution of Zamora's murder. However, we agree there is no evidence to support Vasquez's conviction for being a felon in possession of a firearm.

## STATEMENT OF FACTS

A. **The Relationship Between Appellant And Salinas; Gang Memberships**

According to appellant, Salinas has been her boyfriend since 2009.

Zamora, the victim, belonged to the West Side Wilmas gang. Salinas and appellant belonged to the East Side Wilmas, a rival gang. Appellant joined the gang when she "was a kid."

---

[2] The record contains no information regarding Salinas' sentence.

3

B.   **The BMW And Appellant**

  The People's theory of the case was that appellant drove Salinas to the scene of Zamora's murder in a BMW. One of the contentions on appeal is that the evidence failed to show that appellant was the driver of the BMW. Evidence about appellant's use of a BMW for several weeks before the murder, summarized below, was therefore pertinent.

  Dominique Ramirez owned a 2007 BMW 328i. Appellant, with whom Ramirez regularly used methamphetamine, occasionally borrowed this car during the year 2016. At one point, Ramirez asked appellant to return the car to the dealer because she could not make the payments on the car. Appellant never did as Ramirez asked and eventually Ramirez reported the car stolen.

  On April 7, 2016, about two weeks before the murder, Los Angeles Police Officer Eduard Grijalva conducted a traffic stop on a BMW with an expired registration. Appellant was the driver, and she appeared to be very nervous and fidgety. After a records check, Officer Grijalva cited appellant for driving without a license.

  As discussed more fully below, appellant was in possession of the BMW between February and May of 2016.

C.   **The Events Prior To the Murder**

  At about 8:30 p.m. on April 23, 2016, Elizabeth Leon, a next-door neighbor of Zamora, was smoking with two friends in her car parked in an alley behind her house on Wilmington Boulevard. Another car came through the alley behind Leon, and Leon began to move her car to make way for it to pass. Leon described the car as a tan, newer model four-door vehicle. The driver appeared to her to be a blonde Hispanic woman in her

4

twenties.  The other car stopped and a passenger exited.  Leon saw that there was nobody else in the tan car besides the driver after the passenger left.  The passenger walked through a gate in the alley.  The tan car reversed back out of the alley; Leon drove away.  A surveillance video of this encounter was played for the jury.

The alley in question runs parallel to Wilmington Boulevard and Gulf Avenue and is adjacent to the house where Zamora lived.  There were two surveillance cameras filming the alley, one facing north and the other facing south.  Los Angeles Police Detective Scott Coffee, one of the detectives investigating the murder, viewed the video and concluded that the suspect vehicle on the video was a newer model BMW.  Although Detective Coffee was aware of Leon's statement, he believed the suspect BMW was the one that Leon had seen in the alley because Leon's car was visible in the surveillance footage as well, and the movements of the BMW and Leon's car in the video were consistent with what Leon remembered.  A passenger could be seen exiting the BMW in the video, just as Leon described.

The license plate of the BMW was not readable from the surveillance video.  A BMW looking like the car in the video was located months after the murder in a car lot.  Using the license plate number and Department of Motor Vehicles records, the owner of the BMW was determined to be Dominique Ramirez, appellant's friend.  Detective Coffee believed the BMW in the video and the one found in the car lot were the same vehicle because of the similar make, model, and vehicle color.

Returning to the moments before the murder, Dennis G. was waiting for a friend along a wall that divided two apartment buildings just south of Zamora's address on Wilmington Boulevard. While he waited, Dennis saw Salinas, whom he described as a man wearing a black hoodie pulled over his head,[3] enter the apartments through a door providing access to the alley behind the apartments. Salinas walked through the apartments and turned right on Wilmington. Salinas passed out of view and five or six seconds later, Dennis heard gunshots.

D.    **The Murder**

Zamora's sister, Maria, came home from grocery shopping at around 8:25 p.m. on April 23, 2016. She was standing outside smoking a cigarette when Zamora walked out the front door. He was talking to someone on his cell phone. She heard him saying "I'm here. I'm here. Where are you at? I'm standing outside the sidewalk waiting for you to come." He kept repeating, "Where are you at?" Once he reached the sidewalk, he stopped at the residence's front gate and continued talking on the phone.[4]

Salinas approached Zamora and asked, "Where you from, fool?" According to Maria, Salinas was wearing a gray hooded sweater and creased jeans.[5]

Zamora did not have a chance to respond because Salinas pointed a gun at Zamora's chest and, from two or three inches

---

[3]    Dennis G. identified Salinas from a photo lineup but he stated he was not 100 percent certain of the identification.

[4]    Zamora was expecting a delivery of methamphetamine.

[5]    Maria described Salinas's clothing but she did not see his face

6

away, fired two times.  Zamora tried to head back toward the house, but Salinas fired two more times before turning and running in the other direction, northward on Wilmington Boulevard.  Zamora collapsed near the front door of his home.  In two separate calls, Maria reached 911 dispatchers and reported the shooting.

Baltazar Gallardo (Gallardo), a neighbor of Zamora, heard two gun shots and, followed by his son Luis, ran to the front of his apartment; Gallardo saw a male wearing a black hoodie run away northward on Wilmington Boulevard.

Luis noticed a phone on the sidewalk of Wilmington Boulevard and picked it up.  He handed it to Gallardo.  The phone was disassembled into three parts—the main portion, the battery, and the cover.  It was an LG brand device.  At some point, Gallardo tried to hand the phone to a police officer who had responded to the scene, but the officer ignored Gallardo and told him to go away.  Gallardo took the phone home and placed it in a plastic bag.

E.    **The Aftermath**

At approximately 8:30 p.m., Los Angeles Police Officer Russell Veloni and his partner were notified of a shooting.  They were the first emergency personnel to arrive at the scene.  A witness directed Officer Veloni to the porch of the house, where Zamora was lying face-up with a gunshot wound to the chest.  Zamora's family was frantically attempting to render first aid.  Officer Veloni called for additional support, including an ambulance.  Paramedics responded and transported Zamora for treatment.  He died from bullet wounds to his liver, lung and aorta.

Detective Coffee responded to the scene of the shooting at approximately 10:30 p.m. that night.  He was in charge of the crime scene.  Detective Coffee noticed three expended cartridge casings at the scene and an expended bullet, as well as a blood trail and some bloody clothing.  The three casings had all been fired from the same gun.

Los Angeles Police Officer Sergio Melero contacted Gallardo on the night of the shooting.  Gallardo told Officer Melero about the phone his son Luis had found in the street.  Gallardo turned the phone assembly over to Officer Melero.  Officer Melero passed this phone on to Detective Coffee while it was still disassembled, with the backing, battery, and memory cards removed.

Detective Coffee downloaded and reviewed the contents of the disassembled phone Luis had found.  The phone's memory contained the account name "Salinas" and the passwords "Listo," "ESW," "ESWilmas," and "Dreamer1."  Detective Coffee concluded the phone belonged to Salinas.  He also concluded that the passwords were gang-related words.  "ESWilmas" and "ESW" were commonly known references to the East Side Wilmas street gang, and "Listo" appeared to be a gang moniker.  Other data on the phone confirmed that it belonged to Salinas.  The phone contained photographs of a yard that Detective Coffee knew was located on Lagoon Avenue at a residence of record for Salinas.  In addition, one of the wireless networks in the phone's memory was named "Salinas."

F.    **The Investigation**

Los Angeles Police Officer Noel Sanchez spoke with Ramirez, the registered owner of the BMW, and learned that appellant had possession of the BMW from February through May of 2016.

In July 2016, Los Angeles Police Detective David Cortez received a call from a man who wished to remain anonymous. The caller was "extremely terrified" and did not want to give his name. The man told Detective Cortez Salinas had a girlfriend called "Chica." Searching police databases, detectives linked the name "Chica" to appellant.

Detectives Coffee and Cortez conducted a lengthy interview of appellant on November 10, 2016. During that interview, appellant effectively admitted to being the driver of the BMW that dropped Salinas off in the alley. Detective Coffee was falsely telling appellant that she had been identified as the driver of the BMW. Appellant stated: "I'm not denying that I didn't drive the car, I mean, I was driving the car, you know what I mean?"[6]

## G.    **The Arrest and Undercover Operations**

Salinas and appellant were arrested on November 10, 2016 while they were driving together in a pickup truck on the 110 freeway. They were ultimately taken to separate jails, with appellant ending up in the jail in Van Nuys where she was placed in a cell with recording equipment.

Los Angeles Sheriff's Deputy Elizabeth Aguilera was undercover, pretending to be an inmate. She was placed with appellant in her cell on the day she and Salinas were arrested. The two women spoke about the accusations appellant was

---

[6]    The transcript of appellant's interview with the detectives is Exhibit 87B and is part of the record. The audio was played to the jury; a transcript of the audio was given to the jury. While it is not entirely clear from the record that the entire interview was played to the jury, it was played at least to its page 74.

9

facing.  Appellant told Aguilera that police "ain't got shit on me[7]

Appellant said detectives could not "[s]how me the fucking tape where you see my man in the car with me."  Appellant stated: "I was driving.  That was me.  [¶] . . . [¶]  I was there that day" but she said the passengers in the car were her nephew, daughter, and son.  She said that if anyone got out of her car in the alley that day, it was her daughter.  Alternatively, she denied being present at the scene: "I wasn't there on that day."

The recording becomes largely unintelligible toward its end.  (See fn. 7.)  Deputy Aguilera testified about appellant's response to Aguilera's question "[d]id you guys do a jale?"[8] Aguilera testified that appellant "backed up into the corner under the camera and she said [whispered] " '187.' "

Detective Cortez had photographs taken of appellant. Appellant had a tattoo of the word "Listo" on her upper chest, along with several tattoos stating "Rest in Peace, L Street," "Lil Chico," "In Loving Memory, Lil Chico," and "Eastside Wilmera" on other parts of her body.

On November 18, 2016, Salinas was placed in a cell equipped with a recording device.  There was one other person in the cell.  Salinas told him that he was called "Listo," which matched one of the five passwords on the cell phone found by Luis at the scene.

---

[7]     The conversation between Deputy Aguilera and appellant was recorded.  The transcript of the recording was marked Exhibits 82A and 82B.  The audio of Exhibit 82B was played to the jury.

[8]     "Jale" means doing "work" for a gang.

10

## H.    The Gang Expert Testimony

Los Angeles Police Officer Michael Chang testified as a gang expert.  He confirmed the East Side and West Side Wilmas gangs are rivals.  Chang knew both Salinas and appellant as members of the East Side Wilmas gang and that the former's gang moniker was "Listo."  Zamora was a West Side Wilmas gang member and lived in that gang's territory.

Presented with a hypothetical that embraced the facts of this case, Chang testified the shooting would have been committed for the benefit of, at the direction of, or in association with a street gang with the intent to further, promote, or assist the gang.  The scenario reflects the two East Side gang members working together for a common purpose—killing a rival in his own territory, and creating fear and intimidation in the community to discourage anyone from undermining the gang or reporting crimes to police.  To be the driver in a gang crime, the individual would need to be trusted and considered reliable by her fellow gang members.

## DISCUSSION

## I.    There Is Sufficient Evidence Appellant Aided and Abetted the Murder

Vasquez contends the evidence was insufficient to prove beyond a reasonable doubt she was guilty of murder.  We conclude substantial evidence supported the jury's verdict.

### 1.    *Standard of review*

"In evaluating a claim regarding the sufficiency of the evidence, we review the record 'in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of

11

solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Westerfield* (2019) 6 Cal.5th 632, 713; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 [" 'To assess the evidence's sufficiency, we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.' "]; *People v. Nguyen* (2015) 61 Cal.4th 1015, 1055–1056 (*Nguyen*) [" '[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt . . . .' "].) " 'We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' " (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 162.)

    2.    *Governing law*

Murder is the unlawful killing of a human being "with malice aforethought." (§ 187, subd. (a).) A "willful, deliberate, and premeditated killing" is murder in the first degree. (§ 189) " ' "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance.' " (*People v. Brooks* (2017) 3 Cal.5th 1, 58.) " 'A "person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and (2) the intent or purpose of committing, encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." ' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1054.)

A defendant may be convicted of first degree premeditated murder based on direct aiding and abetting principles, under which "the prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the

12

unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*People v. Chiu* (2014) 59 Cal.4th 155, 167; accord, *People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1024.) " 'Among the factors which may be considered in making the determination of aiding and abetting are:  presence at the scene of the crime, companionship, and conduct before and after the offense.' " (*Nguyen*, *supra*, 61 Cal.4th at p. 1054; accord, *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1065–1066.)

3.      *The Evidence Is Sufficient to Establish Appellant Was Driving the BMW*

Appellant acknowledges the general principles that apply to her contention that the evidence was insufficient to prove she was driving the BMW.  Specifically, appellant acknowledges the substantial evidence standard of review applies.  However, having acknowledged the governing standard, appellant proceeds to ignore it.  Instead of attempting to show that there was no evidence to support the judgment, appellant contends her theory of the case -- that she was not the driver of the BMW -- is more plausible than the People's evidence that she was the driver.

The primary principle of the substantial evidence standard of review is that the reviewing court will rely on the evidence that supports the judgment.  "[W]hen a verdict is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the conclusion reached by the jury." (*Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 (*Crawford*).)

13

There is substantial evidence appellant was the driver of the BMW that deposited Salinas in the alley close to Zamora's home.

The video showed two cars in the alley right before the murder. One was driven by Elizabeth Leon. The other vehicle was a BMW. There is a solid body of evidence that links appellant to the BMW owned by Domonique Ramirez; appellant had possession of the car between February and May 2016. And there is evidence in the form of Detective Coffee's testimony that it was the BMW owned by Ramirez that was the second car in the alley right before the murder.

This is not all there is. Appellant and Salinas were not only personally linked and had been so for some years, but they were also members of the same gang. It is an entirely rational inference that they shared a common objective when it came to the unfortunate Zamora. Thus, it made sense that it was appellant who drove Salinas to the scene.

There is of course no doubt that it was Salinas who murdered Zamora. Dennis G. identified him as he was on his way to the Zamora house. And it was Salinas's phone that was found close to the scene of the shooting. The description of Salinas's clothing by Dennis and Maria, Zamora's sister, is also a match linking Salinas to the shooting.

Appellant herself also provided evidence that supports the judgment. When asked by undercover sheriff's deputy Aguilar if appellant had put in any "work" for the gang, appellant's answer was right to the point. Yes, she had, and the "work" was murder ("187"). This is a significant admission in that it confirms not only the deed itself but also the motive for murder, which was

14

that it was part of the struggle between two criminal street gangs.

It is also true appellant conceded she was in the alley at some point in time and, as the interview with the detectives went on, she admitted she was the driver of the BMW.  "I'm not denying that I didn't drive the car, I mean, I was driving the car, you know what I mean?"  We return to the subject of appellant's admissions below.

Appellant contends her theory was more plausible than that of the People for several reasons.  She contends her hair was not blonde, as Leon testified.  It was dark brown when she was arrested six months after the murder and it was blue when she was cited for driving without a license two weeks before the murder.  She was not in her 20's, as Leon thought, she was 38 years old.  However, that there is evidence in conflict with the evidence supporting the judgment does not mean there is no substantial evidence.  If there is substantial evidence, it does not matter that it is contradicted.  (*Crawford*, *supra*, 3 Cal.2d at p. 429.)  In other words, conflicts in the evidence are disregarded.  (*Ibid* ["conflicts must be resolved in favor of the respondent"].)

Appellant did not deny that at one point she drove into the alley.  Appellant told the detectives she knew one person who lived in the area of the crime scene, her nephew's girlfriend's grandmother, and she only drove to the house once when driving her nephew, son and daughter to and from that location.  She only remembered being in the alley once to make a U-turn.  She may well have tried at this point in the interview to retract her earlier damaging admission that she had driven the car on the night of the murder.  In any event, it is significant that she never

15

retreated from the admission that she had in fact driven into the alley at one point in time.

There is substantial evidence appellant was the driver of the BMW. That evidence is buttressed by appellant's own damaging admissions that she was the driver of the BMW on the night of the murder.

4. *There Is Sufficient Evidence Appellant Knew of and Shared Salinas's Intent to Murder Zamora*

Appellant contends that other than an "otherwise unidentified person in a car parked near a crime scene" and statements by appellant that the "authorities view[ed] as inculpatory," there was "nothing that proves [appellant] knew what Salinas intended to do and acted with the specific intent of assisting him in that conduct."

"[T]he weight of authority and sound law require proof that an aider and abettor act with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

As we noted, there is substantial evidence it was appellant who drove the BMW that stopped in the alley near Leon's car. The arrival of the car at that location with a passenger, Salinas, who was armed, was an event laden with deadly significance. The two people in the BMW, appellant and Salinas, were not only well known to each other but were also members of the same gang who were now in the territory of a rival gang. Thus, the arrival of the BMW at that location was pregnant with the portent of the coming tragedy. The rational inference, given these facts, is that the arrival of the BMW with appellant and

16

Salinas was an event that was planned with a specific objective mind. That objective was Zamora's murder.

The plan for Zamora's murder very obviously subsumed both knowledge of the criminal purpose of Salinas as the shooter and, also on appellant's part, the intent of facilitate the commission of the offense. The plan for the murder could not have been hatched without both knowledge and intent on the part of those planning the killing.

The question is whether the identities of the planners as Salinas and appellant is sufficiently shown by the evidence. In Salinas's case, it is not disputed that a passenger stepped out of the BMW as Leon was watching. In the meantime, Dennis G. was by a wall that separated two apartment buildings just south of Zamora's house on Wilmington Boulevard. Seconds before shots were fired, Dennis saw Salinas walk by with a black hoodie pulled over his head. And there is the crowning fact that it was Salinas who shot Zamora.

Contrary to appellant's contention on appeal, the jury's verdict that appellant was the driver of the BMW is supported by the evidence. Given that she was the driver, her admission to undercover sheriff's deputy Aguilera that she had done "work" for the gang in the form of a "187" confirms that she was the other planner of the enterprise.

Effective January 1, 2019, the Legislature added subdivision (a)(3) to section 188, which provides that a principal for purposes of section 187 must have acted with malice aforethought. (Stats. 2018, ch. 1015, § 2.) This provision goes on to state: "Malice shall not be imputed to a person based solely on his or her participation in a crime." (§ 188, subd. (a)(3).)

17

We are satisfied that the planners of Zamora's murder, Salinas and appellant, both acted with malice aforethought. Conceding that malice aforethought "is an elusive concept that does not lend itself to accurate definition" (1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against the Person, § 103, p. 894), planning a murder, and actively assisting in bringing it about necessarily means the planners harbored malice aforethought.

## II. There Is Insufficient Evidence Appellant Had Constructive Possession of the Firearm

Appellant was found guilty of a violation of section 29800 in that she was a felon in possession of a firearm. The prosecution contended that appellant was in constructive possession of the firearm.

"To establish constructive possession, the prosecution must prove a defendant knowingly exercised a right to control the prohibited item, either directly or through another person." (*People v. Sifuentes* (2011) 195 Cal.App.4th 1410, 1417, overruled on other grounds by *People v. Farwell* (2018) 5 Cal.5th 295, 304, fn. 6.) "But mere proximity to the weapon, standing alone, is not sufficient evidence of possession." (*Sifuentes*, at p. 1417.) Another formulation is that constructive possession is shown by a knowing exercise of dominion and control over the item. (*People v. Mejia* (1999) 72 Cal.App.4th 1269, 1272.)

We do not agree with respondent's contention that "the jury was entitled to infer that appellant knew about and shared control over the gun as part of her and Salinas's [*sic*] joint plan to kill Zamora." There must be some evidence that appellant had the right to control the gun before the jury could conclude that appellant had constructive possession of the gun. But the record

18

contains no evidence whatever regarding the control, if any, appellant had over the gun. While there is direct evidence Salinas had a gun, there is no circumstantial evidence, much less direct evidence, that bears on the extent or fact of control that appellant had over the gun. It is pure conjecture appellant had control over the gun; it is equivalently possible she had no control of it at all.

In light of the foregoing, we reverse appellant's conviction for being a felon in possession of a firearm. As a result, we vacate the attached gang enhancement. Given that the trial court imposed a concurrent term on this count, we conclude there is no need to remand this case to allow the trial court to consider restructuring Vasquez's sentence.

## DISPOSITION

Appellant's conviction of possession of a firearm (Pen. Code, § 29800, subd. (a)(1)) is reversed.  The case is remanded with directions to modify the abstract of judgment to reflect that we have reversed the conviction of a violation of Penal Code section 29800 and vacated the attached gang enhancement (§ 186.22, subd. (b)).  In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, J.

We concur:

BIGELOW, P. J.

WILEY, J.

20