Filed 4/11/16; pub. order 4/22/16 (see end of opn.)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>MARQUON DEANTHONY VASQUEZ,<br><br>       Defendant and Appellant. | C078671<br><br>(Super. Ct. No. 13F01946) |
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>SHOREEM DOMINQUE BRYANT,<br><br>       Defendant and Appellant. | C078866<br><br>(Super. Ct. No. 13F01946) |

Defendants Marquon Deanthony Vasquez and Shoreen Dominique Bryant were tried together in front of separate juries for murder and attempted murder with allegations

these crimes were committed for the benefit of a street gang. Vasquez fatally shot Deandra Horton and wounded her companion, Tionee Duncan, who was confined to a wheelchair. Bryant had driven Vasquez to where the shooting took place and was also the getaway driver. The shooting was retaliation for an altercation between Vasquez's cousin (Kaveon Plummer-Lee) and one of Duncan's friends (Marcus Lebeau). Bryant, Vasquez, and Plummer-Lee were members of the North Highlands Gangster Crips. Lebeau was a member of the rival Bloods.

The first jury found Vasquez guilty of second degree murder (a lesser to the charged first degree murder) and attempted voluntary manslaughter (a lesser to the charged attempted murder) and found not true the gang enhancements. The second jury found Bryant guilty as an aider and abettor of both first degree murder and attempted murder and found true the gang enhancements.

On appeal, Bryant challenges the sufficiency of the evidence for his convictions and the gang enhancements, and Vasquez challenges the sufficiency of the evidence for his convictions, the instructions, and his counsel's performance. Finding no merit in these challenges, we affirm the judgments.

FACTUAL AND PROCEDURAL HISTORY

A

*The Prosecution's Case*

The shooting of Horton and Duncan took place in an apartment complex parking lot around 1:30 p.m. in March 2013. Duncan lived in that apartment complex, and his friend Lebeau helped care for him. That day, however, Duncan was out with his girlfriend Horton, who was pushing Duncan in his wheelchair back to his apartment after an outing to Subway.

Just before the shooting, Bryant and Vasquez had been together in the same complex in the apartment of their friend, Jacquelyn Reese. Bryant and Vasquez walked out of Reese's apartment, and Bryant got in the driver's side of a Chrysler and Vasquez

2

got in the passenger's side.  Bryant drove the car and parked in one of the apartment parking lots.  Vasquez got out of the car and ran to the other side of the parking lot where Horton and Duncan were.  Vasquez went up to Horton and Duncan from behind and opened fire on both of them.  Vasquez fatally shot Horton five times on her backside. Vasquez also shot Duncan in his back, side, shoulder, and hip.  Duncan then shot back, and Vasquez fell to the ground.  Vasquez telephoned Bryant and told him, "Come get me. Come get me."  Immediately, Bryant pulled up in the Chrysler, picked up Vasquez, and "spe[]d out real fast."  Bryant then texted his friend (who was also Vasquez's cousin) Plummer-Lee.

Bryant, Vasquez, and Plummer-Lee were North Highlands Gangster Crips.  About three months before Vasquez's shooting of Horton and Duncan, Plummer-Lee had been shot by rival Bloods gang member Lebeau, while Plummer-Lee was getting out of his grandmother's car.  Vasquez's mother told Vasquez that the shooting of Plummer-Lee by Lebeau had traumatized  her and Vasquez's grandmother, because the shooting happened in front of both women.  According to a gang expert, if one gang member was disrespected, the whole gang considered itself disrespected.  Gang members may retaliate not just against the person who disrespected them, but also against persons associated with the enemy, which instills more fear into their enemies and the community.

The night before the shooting, Vasquez called Bryant, and immediately upon getting off the phone with Bryant, Vasquez called Plummer-Lee.  After talking with Plummer-Lee, Vasquez then called Bryant again.  The next day, about seven to eight minutes before the shooting, Vasquez and Plummer-Lee exchanged phone calls.  Bryant also called Vasquez during that time.

B

*Bryant's Defense*

Bryant testified in his own defense that the phone calls he and Vasquez exchanged before the shootings were about getting "weed."  Bryant happened to be driving near the

3

apartment complex when Vasquez called him and told him that he was hurt. Bryant then drove to the apartment complex and put Vasquez in his car.

## C

### *Vasquez's Defense*

Vasquez testified in his own defense that he lived in the apartment complex with his son's grandmother. Bryant was his friend, but he did not know Duncan or Lebeau. Just prior to the shooting, Vasquez was walking to meet a friend. While en route, he saw a man in a wheelchair (Duncan) with a woman (Horton) about 10 to 15 feet ahead of him. Horton looked back, whispered something to Duncan, and then Duncan looked back at Vasquez. The next thing Vasquez knew, Duncan pulled out a revolver. Vasquez then pulled out his own gun. Duncan fired the first two or three shots, "like pretty slow." Vasquez "had a semi-automatic, so [he] start[ed] firing pretty quick." He was aiming toward Duncan. The only thing blocking his aim was Horton, whom Duncan was using as a human shield. Vasquez stopped shooting because he had been shot in the leg, felt his leg go out, and was on the ground.

## I

## DISCUSSION

### *Substantial Evidence Supported Bryant's Convictions*

### *On An Aiding And Abetting Theory*

Bryant contends there was insufficient evidence he aided and abetted Vasquez in shooting Horton and Duncan. According to Bryant, he was guilty at most of being an accessory after the fact by helping Vasquez flee the scene. We disagree, because there was evidence that Bryant "act[ed] with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense," which was required for aider and abettor liability. (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

4

Here, the following evidence supported the jury's verdict that Bryan acted with knowledge of Vasquez's criminal purpose to murder Horton and attempt to murder Duncan and with the purpose or intent of committing or encouraging Vasquez's commission of these offenses. Bryant, Vasquez, and Plummer-Lee were North Highlands Gangster Crips. The night before the shooting, Vasquez called Bryant, and immediately upon getting off the phone with Bryant, Vasquez called Plummer-Lee. After talking with Plummer-Lee, Vasquez then called Bryant again. The next day, about seven to eight minutes before the shooting, Vasquez and Plummer-Lee exchanged phone calls. Bryant also called Vasquez during that time. A reasonable inference is that these phone calls were about the shooting that was just about to occur, as Plummer-Lee had a stake in the shooting, as the victim of a shooting by Duncan's friend Lebeau. Then, Bryant and Vasquez walked out of Reese's apartment together. Bryant got in the driver's side of the Chrysler and Vasquez got in the passenger's side. Bryant then dropped Vasquez off at a location where Vasquez could run to where Horton and Duncan were. From that location, Vasquez was able to approach Horton and Duncan from behind and start shooting them. And then when Vasquez got shot, he called Bryant and told him, "Come get me. Come get me." Immediately, Bryant pulled up in the Chrysler, picked up Vasquez, and then "spe[]d out real fast." Bryant then texted Plummer-Lee. Thus, Bryant was in close contact with both Vasquez and Plummer-Lee before Vasquez shot Horton and Duncan, he drove Vasquez to a location where Vasquez could sneak up on his victims from behind, he helped Vasquez flee the scene, and then he contacted Plummer-Lee after the shooting. In light of these facts, there was substantial evidence to support Bryant's convictions on an aiding and abetting theory.

5

## II

### *The Jury Properly Found Bryant Guilty Of First Degree Murder*
### *On A Direct Aiding And Abetting Theory*

Bryant contends that his conviction for first degree murder must be reversed or reduced to second degree murder because the jury could have found him guilty as an aider and abettor of first degree premeditated murder based on a natural and probable consequences theory, an unlawful theory under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*).  As we explain in detail below, this is not so.  The instructions required the jury to find Bryant acted willfully, deliberately, and with premeditation.  And, to the extent the jury could have found that the shooting of Horton was the result of transferred intent, *Chiu* is not applicable because the doctrine of transferred intent does not implicate the concerns raised in *Chiu,* in which the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder.

"There are two distinct forms of culpability for aiders and abettors.  'First, an aider and abettor with the necessary mental state is guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' " (*Chiu*, *supra*, 59 Cal.4th at p. 158.)  *Chiu* involved the second form of aider and abettor culpability.  (*Ibid*.)  The *Chiu* court held and explained, "an aider and abettor may not be convicted of first degree *premeditated* murder under the natural and probable consequences doctrine.  Rather, his or her liability for that crime must be based on direct aiding and abetting principles." (*Id*. at pp. 158-159.)  The mental state for willfulness, premeditation, and deliberation are uniquely subjective and personal.  (*Id*. at p. 166.)  The connection between a defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and abettor liability for first degree murder under the natural and probable consequences

6

doctrine, especially in light of the severe penalty and public policy concerns of deterrence. (*Ibid.*) However, "[a]iders and abettors may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Ibid.*) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Id.* at p. 167.)

Here, the jury was not instructed on the natural and probable consequences doctrine concerning aiding and abetting. Rather, it was instructed on the required findings for directly aiding and abetting the crimes.[1]

Nevertheless, Bryant contends the jury could have found the shooting of Horton was the result of transferred intent and a natural and probable consequence of the shooting of Duncan. From this, he argues that he cannot be liable for first degree

---

[1] Specifically, the jury was instructed pursuant to CALCRIM No. 401 as follows:

"To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that:

"One: The perpetrator committed that crime;

"Two: The defendant knew the perpetrator intended to commit the crime;

"Three: Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime;

"Four: The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime.

"Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime. If all of these requirements are proved, the defendant does not need to actually have been present when the crime was committed to be guilty as an aider and abettor."

premeditated murder under the natural and probable consequences doctrine according to *Chiu*, and that his conviction must be reversed because it could have been based on this legally incorrect theory. The problem with this argument, though, is the doctrine of transferred intent does not implicate the concerns expressed in *Chiu*, in which the connection between the defendant's culpability and the perpetrator's premeditative state was too attenuated to impose aider and abettor liability for first degree murder. We explain below.

When intent to kill is at issue in murder, it may be proven through the doctrine of transferred intent. " 'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had " ' the fatal blow reached the person for whom intended.' " [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' " (*People v. Bland* (2002) 28 Cal.4th 313, 320-321.) On the other hand, aiding and abetting liability under the natural and probable consequences doctrine occurs when a person is found guilty not only of the intended crime (the target offense) but also of any other crime the perpetrator actually commits (the nontarget offense) that is a natural and probable consequence of the intended crime. (*Chiu, supra*, 59 Cal.4th at p. 161.) " 'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' " (*Ibid*.) "A nontarget offense is a ' "natural and probable consequence" ' of the target offense if, judged objectively, the additional offense was reasonably foreseeable." (*Ibid*.) "[L]iability ' " is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' " (*Id*. at p. 162.) Thus, the connection between a defendant's culpability and the perpetrator's premeditative state is too attenuated to impose aider and

8

abettor liability for first degree murder under the natural and probable consequences doctrine. (*Id*. at p. 166.) But, the doctrine of transferred intent does not implicate this concern. This is because under the transferred intent doctrine, the intent required for the crime at issue (here, intent to kill for premeditated murder) was already established with respect to Bryant and was transferred to the ultimate victim (Horton). Thus, we reject Bryant's argument that he could not be found guilty of first degree premeditated murder under this scenario.

III

*There Was Sufficient Evidence To Support*

*The Jury's True Finding On The Gang Enhancements As To Bryant*

Bryant contends there was insufficient evidence to support the jury's findings that the murder of Horton and attempted murder of Duncan were committed for the benefit of a gang. Specifically, he argues that "[i]n the instant case, no evidence but the expert's testimony supported the finding that the offenses . . . were gang-related," and since a gang expert's testimony alone is insufficient to show that an offense is gang related (*People v. Ferraez* (2003) 112 Cal.App.4th 925, 931), the jury's true findings were not supported by substantial evidence.

The factual premise of Bryant's argument is wrong. There was evidence apart from the expert's testimony to prove that Bryant committed the murder and attempted murder "for the benefit of, at the direction of, or in association with any criminal street gang," and "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).) Leaving aside the gang expert's testimony, there was the following evidence to prove the gang enhancements: Bryant, Vasquez and Plummer-Lee were calling back and forth before the crimes; Bryant drove Vasquez to where the crimes were going to be committed and was his getaway driver; Vasquez was a self-admitted member of the North Highland Gangster Crips, Lebeau (who had gotten into a fight with Plummer-Lee) was a Blood, all of Bryan's friends were

9

gang members, and Plummer-Lee was Bryant's friend. What the gang expert did was explain the effect of disrespecting gang members and then how gang members or associates thereof instill fear in rival gang members and others by committing crimes against friends and associates of the rival gang. While this testimony alone "would not have been sufficient to find the . . . offense[s] was gang related," "here it was coupled with other evidence [we have just recounted] from which the jury could reasonably infer the crime[s] w[ere] gang related." (*People v. Ferraez*, *supra*, 112 Cal.App.4th at p. 931.)

IV

*Substantial Evidence Supported Vasquez's Conviction*

*For The Second Degree Murder Of Horton*

Vasquez contends there was insufficient evidence he was guilty of the second degree murder of Horton because there was no evidence he acted with malice when he shot Horton. Not so, because there was evidence Vasquez acted with either express or implied malice, i.e., with "a deliberate intention unlawfully to take away the life of a fellow creature" (express malice) or "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart" (implied malice). (Pen. Code, § 188.) Bystanders who saw the shooting testified that Vasquez shot at Horton multiple times before Duncan ever fired his gun. Specifically, Vasquez walked through a gate and just started shooting at Horton and Duncan at least six times. From this testimony, the jury reasonably concluded that shooting at a person multiple times without any provocation constituted malice.

V

*The Trial Court Properly Did Not Instruct On Involuntary*

*Manslaughter, And Vasquez's Trial Counsel Was Not*

*Ineffective For Failing To Ask For That Instruction*

Vasquez contends the court should have instructed on involuntary manslaughter or his attorney was ineffective for failing to ask for that instruction. As we explain, no

10

instruction on involuntary manslaughter was required on either of the two theories Vasquez now puts forth, because there was insufficient evidence to support either. We explain below.

The first theory Vasquez argues that the trial court was required to instruct on involuntary manslaughter because his "possession of a firearm which resulted in Horton's death amounted to an unintentional killing in the course of a noninherently dangerous felony [possession of a firearm by a felon] committed without due caution or circumspection." The second theory Vasquez argues is that "the killing of Horton was committed during an assaultive felony but without malice and, therefore, his actions were neither murder nor voluntary manslaughter."

The problem with both arguments is that even accepting Vasquez's version of the shooting for purposes of examining if an involuntary manslaughter instruction should have been given, there still was no evidence from which the jury could have found defendant acted without malice (if it was going to find that he did not act in self-defense). And a lack of malice is required for an involuntary manslaughter instruction. (*People v. Bryant* (2013) 56 Cal.4th 959, 966-967.) By Vasquez's own version of events, he was 10 to 15 feet from Duncan when he saw Duncan pull out a revolver. Before Duncan fired at Vasquez, Vasquez had already pulled out his own gun. Duncan fired the first two or three shots, "like pretty slow." Vasquez "had a semi-automatic, so [he] start[ed] firing pretty quick." He was aiming toward Duncan. The only thing blocking his aim was Horton, whom Duncan was using as a human shield. Accepting these facts, Vasquez knew of the risk to Horton when he pulled out his gun and begin firing. He was either not guilty based on self-defense or he was guilty of malice murder, not of the lesser included offense of involuntary manslaughter. (See *People v. Guillen* (2014) 227 Cal.App.4th 934, 1028 [when there is no question the appellant knew the risk to life to the decedent when he acted, it is a "a case where . . . the appellant[], if he was guilty at all, was guilty of the greater offense of second degree murder and not of the lesser

11

included offense of involuntary manslaughter. Thus, the trial court did not err in failing to instruct the jury sua sponte on the lesser included offense of involuntary manslaughter"].)

Thus, Vasquez's theory that the court should have instructed on involuntary manslaughter or his counsel was ineffective for failing to ask for that instruction was not supported by the evidence.

DISPOSITION

The judgments are affirmed.

/s/
Robie, J.

We concur:

/s/
Nicholson, Acting P. J.

/s/
Renner, J.

12

Filed 4/22/16

CERTIFIED FOR PARTIAL PUBLICATION*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>MARQUON DEANTHONY VASQUEZ,<br><br>    Defendant and Appellant. | C078671<br><br>(Super. Ct. No. 13F01946)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>SHOREEM DOMINIQUE BRYANT,<br><br>    Defendant and Appellant. | C078866<br><br>(Super. Ct. No. 13F01946)<br><br>ORDER CERTIFYING OPINION FOR PARTIAL PUBLICATION |

---

\* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts I, III, IV, and V of the Discussion.

13

THE COURT:

The opinion in the above-entitled matter filed April 11, 2016, was not certified for publication in the Official Reports.  For good cause it appears now that the opinion should be partially published in the Official Reports and it is so ordered.

BY THE COURT:


/s/
Nicholson, Acting P. J.


/s/
Robie, J.


/s/
Renner, J.

EDITORIAL LISTING

C078671 People v. Vasquez

APPEAL from judgment of the Superior Court of Sacramento County, Greta Fall, Judge.  Affirmed.

Patricia J. Ulibarri, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputies Attorney General, for Plaintiff and Respondent.


C078866 People v. Bryant

APPEAL from judgment of the Superior Court of Sacramento County, Greta Fall, Judge.  Affirmed.

John F. Schuck, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Jennifer M. Poe, Deputies Attorney General, for Plaintiff and Respondent.