Filed 4/28/21  P. v. Bhushan CA1/2

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>VIJAY BHUSHAN,<br><br>    Defendant and Appellant. | A159917<br><br>(Alameda County<br>Super. Ct. No. C175094A) |

Vijay Bhushan appeals from the denial of his petition to vacate his first degree murder conviction pursuant to Penal Code section 1170.95.  He contends the trial court erred in finding he failed to make a prima facie showing of entitlement to relief and in relying upon the record of conviction and this court's prior opinion in denying the petition.  We affirm.

## BACKGROUND

Bhushan was convicted of the 2012 murder of Jubrille Jordan (Pen. Code, § 187, subd. (a))[1] and attempted murder of Wyone Bordley (§§ 664/187, subd. (a)), as were two codefendants, Marquise Thomas[2] and

---

[1] All further statutory references will be to the Penal Code.

[2] Thomas is apparently also known as Marquise Thompson, and was charged under both names.  Our prior opinion identified him as Thompson because that was the name used in the original trial court proceedings.  The

Jones. The facts of the underlying offenses are taken from our 2018 opinion affirming Bhushan's conviction (*People v. Bhushan* (Nov. 30, 2018, A145855) [nonpub. opn.] (*Bhushan*)).[3]

On the afternoon of December 30, 2012, 15-year-old Jubrille Jordan was killed by a bullet to her head as she was standing on the sidewalk near the "69th Avenue Village" (Village) housing complex in Oakland. She was waiting with her sister, two young male friends, and a baby while another friend stopped to talk with two other male friends. One of the young men in the group, Wyone Bordley, was contemporaneously shot in the foot.

Bordley was the intended target of the shooting. About six months earlier, another 15-year-old, Hadari Askari, had been shot to death in the Village. Although no one had been charged, Askari's family and friends had information that Bordley was the killer, and they wanted him killed in revenge. There was an understanding that a group of young men including Bhushan, Thomas, and Jones would "take care of it."

On December 30, 2012, Askari's cousin Marquesha Ruth saw Bordley in the Village. She called Bhushan and Sammie Standberry, her brother, and told them where she had seen Bordley. As Ruth and Standberry were waiting outside their apartment, Bhushan drove up with Thomas in the passenger seat and Jones in the back. The three said they were "getting

_____

trial court proceedings we review here used the name Thomas, and we follow suit.

[3] Bhushan and Jones were tried together; Thomas's case was severed and tried separately, but the cases were consolidated for appeal. We affirmed Thomas's convictions, as well as Bhushan's. We conditionally reversed Jones's convictions due to a change in law requiring the juvenile court to determine Jones's fitness for treatment within the juvenile justice system. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 303, 305.) Jones was 17 years old when the offenses were committed.

2

ready to go over to the 6-9 Village and take care of Bordley," which Ruth took to mean they were going to kill him. Specifically, Bhushan said, "Man, we about to go over there and get on this nigga . . ." and the others in the car nodded. About half an hour after the group in the car drove away, Ruth learned there had been a shooting in the Village in which an innocent girl was killed, and hoped Bhushan, Thomas, and Jones didn't have anything to do with it.

The next morning, Ruth heard Thomas tell Standberry that he was mad because "when he got over there" Bhushan was scared and "froze up," so Thomas "took matters into his own hands." In a recorded call between Ruth, Bhushan, and Ruth's son, Terrence Thompkins (in jail at the time), Ruth told Thompkins, with reference to the shooting, that "[t]hey said he [i.e., Bhushan] was looking at the nigga and froze up" and that Thomas and Jones "got back his out [*sic*] and shit got ugly man." Bhushan said he would write and tell Thompkins about it. A week or two later, Ruth heard Bhushan tell Standberry that he did not "freeze up," he "just felt that it was not a good time."

On December 31, 2012, Thomas was detained by San Francisco police officers and a loaded Smith and Wesson was found in his waistband. The bullet recovered from Jubrille Jordan's body was determined to have been fired from this weapon. Eight shell casings found on the sidewalk at the scene of the shooting came from this weapon, and a box of ammunition matching that found at the scene was found in a search of Thomas's home.

Bhushan was arrested on January 9, 2014. His bedroom was searched pursuant to a warrant and a loaded Glock nine-millimeter handgun was found in a backpack. Twelve casings found on the street at the scene of the shooting came from this weapon.

3

Video clips from cameras in the Village showed two men walking into the garage area of the complex at 3:27 p.m.: One, slightly taller, was wearing red pants, a black hoodie with a white shirt underneath and white shoes, and the other was wearing a gray hoodie, blue jeans and blue and white shoes. The two approached a silver vehicle parked on 66th Avenue; a person in a white shirt got out of the driver seat and moved into the back seat, the person in the gray hoodie got into the driver's seat, and the person in red pants got into the front passenger seat; and the car pulled out. In another clip, a person wearing red pants and a black hoodie walked along the sidewalk with a person wearing a gray hoodie with a white shirt underneath and dark shoes; the two split up, the one in the gray hoodie moving into the street and the one in red pants remaining on the sidewalk, then each fired several rounds, and they ran away together.

Shown the video footage of the men walking in the Village, but not of the actual shooting, Ruth thought the man in the black hoodie and red pants was Thomas, because he always wears a black hoodie, and thought the one in the gray hoodie was Bhushan, based on his walk and stature. Bhushan was "about 5'11" and weighed 180 pounds"; Jones was "about 6'1" and close to 200 pounds" and Thomas was "about 5'7" and 150 to 160 pounds."

Oakland Police Sergeant Bradley Baker, the lead investigator on the case, testified that on one of the later clips, the person in the gray hoodie appeared to be smaller in stature than when seen on earlier clips, and was wearing a white shirt that did not appear earlier, as well as different colored shoes. Baker believed that the shooter in the gray hoodie was not the same person as the one in a gray hoodie seen walking through the Village; instead, based on the white shirt under the hoodie, shoe color and

4

shorter height, he thought the shooter was more consistent with the person seen in the video getting out of the driver's seat and moving to the back seat.

On the evening of December 30, 2012, Thomas texted Bhushan, "Y'all seen the news? One nigga got hit and a bitch died. Born to be a real nigga." Bhushan texted Jones, "You my son now nigga. Welcome to redrum." Jones replied, "It's official . . . which one." Bhushan texted, "a bitch dude just got hit up watch the 10 news" and then "delete these messages too." Baker explained that "redrum" was a reference to homicide—murder spelled backwards.

Jail phone calls recorded after Bhushan's arrest in January 2014, appeared to refer to the gun found in his bedroom being tied to the shooting. Baker testified that a letter from Thompkins to Bhushan postmarked January 18, 2013, saying "you never told me what happened in the 9 with the little nigga," was referring to the shooting of Jordan and Bordley, "the 9" a reference to the location.

A letter from Bhushan to Thompkins, sent in March 2013, explained Bhushan's perspective on the shooting. Bhushan denied he ever "froze, went out or stood down" and said that when they "seen them with some bitches and little kids and babies" he "was like, we catch him another time," but Thomas "was like fuck that. Give me that thang and your hoodie. So I did." Bhushan continued that they "didn't get the job done" and "[t]hat shit didn't post to or even shouldn't took place. It was already bad, but he forced and pushed the issue and look how shit turned out. But that's what happened. I didn't freeze up. Shit just wasn't right.

Bhushan, Thomas and Jones were each charged with one count of murder (§ 187, subd. (a)) and one count of premeditated attempted murder

5

(§§ 187, subd. (a), 664, subd. (a)).  The amended information alleged that Bhushan was armed with a firearm (§ 12022, subd. (a)(1)) and that Thomas and Jones each personally and intentionally discharged a firearm, causing great bodily injury and death (§§ 12022.7, subd. (a), 12022.53, subds. (b)-(d), (g), 12022.5, subd. (a)).[4]  Bhushan and Jones were tried together; the jury found both guilty of first degree murder and premeditated murder and found true the allegations that Bhushan was armed with a firearm and Jones used a firearm.[5]  After a separate trial, Thomas was also convicted of first degree murder and premeditated attempted murder, but the firearm use allegations were found not true.  Bhushan was sentenced to a total prison term of 34 years to life.

On appeal, Bhushan argued the jury instructions improperly allowed him to be convicted of first degree murder in violation of *People v. Chiu* (2014) 59 Cal.4th 155, 158 (*Chiu*), which held that an aider and abettor may not be found guilty of first degree murder on a theory of natural and probable consequences, and *People v. Rivera* (2015) 234 Cal.App.4th 1350, which applied *Chiu's* reasoning to liability for first degree murder based on the natural and probable consequences of a conspiracy.  (*Bhushan, supra,* A145855.)

The jury was instructed that a person may be guilty of a crime either as a direct perpetrator or as an aider and abettor; that "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the

---

[4] The section 12022.53, subdivision (d), allegation was subsequently withdrawn by the prosecution as to Jones.

[5] Jones was additionally charged with and convicted of unlawful firearm activity (§ 29820, subd. (b)).

commission of the first crime"; and that to prove a defendant's guilt based on aiding and abetting, the prosecutor must prove the defendant knew of the perpetrator's unlawful purpose and specifically intended to, and did in fact, "aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The instructions then explained the requirements for finding guilt based on membership in a conspiracy and the rule that "[a] member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy . . . even if the act was not intended as part of the original plan."

Bhushan argued these instructions improperly allowed the jury to find him guilty of first degree murder based on a theory that Jordan was killed as a natural and probable consequence of the premeditated murder of Bordley, in violation of *Chiu* and *Rivera.* He maintained it was impossible to conclude beyond a reasonable doubt that the verdict rested on a permissible theory because it was clear he was not the direct perpetrator and the prosecutor urged the jury to rely upon the natural and probable consequences doctrine. The prosecutor portrayed Bhushan's role as participating in the conspiracy to kill Bordley, driving to the Village, providing the gun and hoodie when he traded places with Thomas, and acting as getaway driver and lookout. (*Bhushan, supra,* A145855.)

We rejected Bhushan's argument. We pointed out that the argument addressed only the instructions on conspiracy, not aiding and abetting, as only the instructions on conspiracy discussed natural and probable consequences, and the prosecutor argued that Bhushan could be liable either as a *direct aider* and abettor *or* as a conspirator. Guilt based on

7

natural and probable consequences under a conspiracy theory would not pose a problem under *Chiu* because a conspiracy to commit murder is necessarily a conspiracy to commit first degree murder, each conspirator acting "with a state of mind 'functionally indistinguishable from the mental state of premeditating the target offense of murder.' " (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) Here, the intent to kill Bordley established by finding a conspiracy to commit murder would establish intent to kill an unintended victim killed accidentally pursuant to the doctrine of transferred intent. (See *People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1025–1026 ["doctrine of transferred intent does not implicate the concerns raised in *Chiu*"].)

Furthermore, we explained, "the instructions directed the jury that regardless of the theory of murder, a defendant could be found guilty of first degree murder only if that defendant acted "willfully, deliberately, and with premeditation." Specifically, the jury was instructed, "If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in CALCRIM 521. [¶] A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation." Under the instructions given, the jury could not have found Bhushan guilty of first degree murder based on the perpetrator's mental state without finding that Bhushan possessed the requisite mental state. (*Bhushan, supra,* A145855.)

After we affirmed Bhushan's convictions, he filed a petition for review in the California Supreme Court (S253098), which was denied on March 13, 2019.

8

On March 14, 2019, Bhushan filed a petition to vacate his conviction pursuant to section 1170.95, asserting he was tried under a felony murder or natural and probable consequences theory, was convicted of first degree murder and attempted murder after a jury trial, did not personally kill Jordan or attempt to kill Bordley, and could not be convicted of first or second degree murder because of changes to sections 188 and 189. The trial court ordered the district attorney to respond to the petition. The response was filed on May 6, 2019, Bhushan's reply was filed on July 3, 2019, and Bhushan filed a supplemental brief on December 19, 2019.[6] At a hearing on February 7, 2020, the trial court found Bhushan failed to establish a prima facie case and denied the petition.

## DISCUSSION

Section 1170.95 was enacted as part of Senate Bill No. 1437 (2017-2018 Reg. Sess.), which became effective on January 1, 2019. (Stats. 2018, ch. 1015, § 4.) Previously, "a defendant who aided and abetted a crime that ended in a victim's death could be convicted of murder under the natural and probable consequences doctrine even if the defendant personally did not act with malice aforethought. The natural and probable consequences doctrine provides that ' "[a] person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' (*People v. Medina* (2009) 46 Cal.4th 913, 920.)" (*People v. Offley* (2020) 48 Cal.App.5th 588, 595 (*Offley*).)

---

[6] In this brief, Bhushan joined in the arguments made by Thomas in a separately filed supplemental brief regarding Thomas's section 1170.95 petition to vacate. The trial court heard Thomas's and Bhushan's petitions together.

"Senate Bill No. 1437 was enacted to abolish this doctrine in cases of murder." (*Offley, supra,* 48 Cal.App.5th at p. 595.) Among its findings, the Legislature stated, "[i]t is necessary to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).) "Except as stated in subdivision (e) of Section 189 of the Penal Code [pertaining to felony murder], a conviction for murder requires that a person act with malice aforethought. A person's culpability for murder must be premised upon that person's own actions and subjective mens rea." (Stats. 2018, ch. 1015, § 1, subd. (g).)

Senate Bill No. 1437 "amended section 188 to require that, when the felony-murder rule does not apply, a principal in the crime of murder 'shall act with malice aforethought,' and that '[m]alice shall not be imputed to a person based solely on his or her participation in a crime.' (Stats. 2018, ch. 1015, § 2, [p. 6675]; *In re R.G.* (2019) 35 Cal.App.5th 141, 144.) As a result, the natural and probable consequences doctrine can no longer support a murder conviction. ([*People v.*] *Lopez* [(2019)] 38 Cal.App.5th [1087,] 1103 & fn. 9, review granted [Nov. 13, 2019, S258175]; Stats. 2018, ch. 1015, § 1(f), [p. 6674].) The change did not, however, alter the law regarding the criminal liability of direct aiders and abettors of murder because such persons necessarily 'know and share the murderous intent of the actual perpetrator.' (*People v. McCoy* (2001) 25 Cal.4th 1111, 1118; see *Chiu, supra,* 59 Cal.4th at p. 167 [a direct aider and abettor 'acts with the mens rea required for first degree murder'].) One who directly aids and

10

abets another who commits murder is thus liable for murder under the new law just as he or she was liable under the old law." (*Offley, supra,* 48 Cal.App.5th at pp. 595–596, fn. omitted.)

Section 1170.95 "permits a person convicted of murder under a natural and probable consequences theory to petition the court to have the murder conviction vacated and to be resentenced. (§ 1170.95, subds. (a) & (e); Stats. 2018, ch. 1015, § 4, [pp. 6675–6677].)" (*Offley, supra,* 49 Cal.App.5th at p. 596.) Subdivision (a) of section 1170.95 provides:

"A person convicted of felony murder or murder under a natural and probable consequences theory may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply:

"(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine.

"(2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder.

"(3) The petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019."

Pursuant to subdivision (c) of section 1170.95, "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response

11

within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

After issuance of an order to show cause, the trial court must hold a hearing unless the parties waive the hearing and "stipulate that the petitioner is eligible to have his or her murder conviction vacated and for resentencing." (§ 1170.95, subd. (d)(2).) At the hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing. If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges. The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (§ 1170.95, subd. (d)(3).)

Bhushan argues the trial court erred in denying his petition based on factual determinations made in our *Bhushan* opinion because it was required to accept the factual assertions in his petition as true unless facts in the record refuted them as a matter of law. Bhushan relies on *People v. Drayton* (2020) 47 Cal.App.5th 965 (*Drayton*), which held that in determining whether a petitioner has made a prima facie showing of entitlement to relief under section 1170.95,[7] "the trial court should accept

---

[7] As *Drayton* described, most Courts of Appeal have interpreted section 1170.95, subdivision (c), as requiring two separate inquiries to be made by a trial court: one, prior to appointing counsel for the petitioner and receiving

12

the assertions in the petition as true unless facts in the record conclusively refute them as a matter of law" and "should not weigh evidence or make credibility determinations." (*Drayton*, at p. 968.)  "If, accepting the petitioner's asserted facts as true, he or she meets the requirements for relief listed in section 1170.95, subdivision (a), then the trial court must issue an order to show cause." (*Ibid.*)

*Drayton* explained that the trial court "should not evaluate the credibility of the petition's assertions, but it need not credit factual assertions that are untrue as a matter of law—for example, a petitioner's assertion that a particular conviction is eligible for relief where the crime is not listed in subdivision (a) of section 1170.95 as eligible for resentencing." (*Drayton, supra,* 47 Cal.App.5th. at pp. 976, 980.)  Analogizing to habeas corpus procedures, the *Drayton* court stated, "if the record 'contain[s] facts refuting the allegations made in the petition . . . the court is justified in making a credibility determination adverse to the petitioner.' ([*In re*] *Serrano* [(1995)] 10 Cal.4th [447,] 456.)  However, this authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subd. (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving

briefing, to determine whether the petitioner has made a prima facie showing of *eligibility* for relief and a second, after appointment of counsel and briefing from the parties, to determine whether the petitioner has made a prima facie showing of *entitlement* to relief.  (*Drayton, supra,* 47 Cal.App.5th at pp. 975–976; *People v. Verdugo* (2020) 44 Cal.App.5th 320, 328 (*Verdugo*), review granted Mar. 18, 2020 (S260493).)  Division One of this court, to the contrary, has held a single prima facie review is required, with counsel appointed for the petitioner and briefing from the parties if the petition is facially sufficient.  (*People v. Cooper* (2020) 54 Cal.App.5th 106,118–123, review granted Nov. 10, 2020, S264684; *People v. Daniel* (2020) 57 Cal.App.5th 666, 673–674, review granted Feb. 24, 2021, S266336.)

the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)." (*Id.* at p. 980.)

*Drayton* involved Senate No. Bill 1437's redefinition of felony murder to limit liability to a person who was the actual killer, who " 'with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree' " or who "was a major participant in the underlying felony and acted with reckless indifference to human life." (*Drayton, supra,* 47 Cal.App.5th at pp. 972–973, quoting § 189.) The section 1170.95 petition in that case turned on whether the petitioner came within the last of these categories. (*Drayton,* at p. 973.) The petitioner maintained he did not act with reckless indifference to human life and there had been no prior finding by a factfinder or admission on this point, but the trial court found the petitioner acted with reckless indifference based on the testimony at the preliminary hearing. (*Id.* at pp. 973, 981–982.) *Drayton* held the trial court erred in denying the petition without issuing an order to show cause because, at the prima facie stage, the trial court "should not have evaluated and weighed the evidence but instead should have accepted petitioner's asserted facts as true." (*Id.* at p. 982.) The trial court "should not have engaged in this factfinding without first issuing an order to show cause and allowing the parties to present evidence at a hearing, as described in section 1170.95, subdivision (d)." (*Ibid.*)

Here, Bhushan argues the trial court improperly deferred to two "factual findings" made in our *Bhushan* opinion—that each defendant had the intent to kill and that the jury was not instructed on the natural and probable consequences doctrine. Bhushan asserts "these conclusions could

14

have been drawn only by improper fact-finding" and maintains the conclusion that the jury was not instructed on natural and probable consequences is incorrect and "conclusively refuted by the record."

Bhushan's arguments miss the mark. Unlike the situation in *Drayton*, the trial court here did not weigh evidence and make factual findings. Rather, it based its determination that Bhushan failed to make a prima facie showing on *legal conclusions* stated in our opinion. As earlier described, we held that the jury's verdict necessarily showed Bhushan was convicted as a *direct* aider and abettor, not under a natural and probable consequences theory, because the jury was not instructed on natural and probable consequences with respect to aiding and abetting, only in connection with conspiracy; the prosecutor argued Bhushan was guilty either as a *direct* aider and abettor or as a conspirator; and the jury was instructed that "regardless of the theory of murder, a defendant could be found guilty of first degree murder only if that defendant acted "willfully, deliberately, and with premeditation." (*Bhushan, supra,* A145855.)

Bhushan's argument that the record refutes our conclusion in *Bhushan* that the jury was not instructed on natural and probable consequences is based on the trial court having instructed, pursuant to CALCRIM No. 400, "[u]nder some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may also be found guilty of other crimes that occurred during the commission of the first crime," and also that a member of a conspiracy is criminally responsible for any act done to further the conspiracy that is "a natural and probable consequence of the common plan or design of the conspiracy." The instructions then explained that "[a] natural and probable consequence is one that a reasonable person would know is likely to happen if nothing

15

unusual intervenes.  In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence."[8]

Bhushan asserts the trial court at the hearing on his petition rejected his argument that the jury could have relied on a natural and probable consequences theory by "arguing that the superior court should not have instructed the jury on the natural and probable consequences theory." Bhushan contends that the fact the jury should not have been instructed on natural and probable consequences "does not negate the fact that [his] jury *did* receive this instruction" and that by showing the jury was instructed on natural and probable consequences, Bhushan provided sufficient evidence to establish a prima facie showing of eligibility for relief under section 1170.95.

Bhushan mischaracterizes the trial court's reasoning.  The trial court did not reject Bhushan's argument because it found the jury should not have been instructed on the natural and probable consequences theory.  The trial court rejected the argument that the jury could have relied on this

---

[8] As we described in *Bhushan,* immediately following the portion of CALCRIM No. 400 quoted in the text, the jury instructions went on to explain the requirements for proof of aiding and abetting and proof of withdrawal prior to commission of the offense but did not further explain the "specific circumstances" that might result in liability for unintended crimes. The instructions then moved on to liability under a conspiracy theory.

After noting that the quoted instruction is a portion of the introductory "general principles" of aiding and abetting set forth in CALCRIM No. 400, which is to be given " '[i]f the prosecution is also relying on the natural and probable consequences doctrine' " (CALCRIM No. 400, Bench notes, Instructional Duty), we stated that the instruction was superfluous and should not have been given at Bhushan's trial because the prosecutor did not rely upon the natural and probable consequences doctrine with respect to aiding and abetting liability and the court did not instruct on the doctrine with respect to aiding and abetting.  (*Bhushan, supra,* A145855.)

theory to find Bhushan guilty as an aider and abettor because we held in *Bhushan* that the jury *did not* rely upon natural and probable consequences with respect to aiding and abetting. Nothing Bhushan presented to the trial court at the hearing on his section 1170.95 petition alters the fact that the jury was not instructed on the natural and probable consequences theory as a basis for liability as an aider and abettor, only as a basis for liability as a conspirator.[9]

Bhushan points to *People v. Soto* (2020) 51 Cal.App.5th 1043 (*Soto*), review granted September 23, 2020 (S263939), which upheld the denial of a section 1170.95 petition based on the jury instructions given at trial without reliance upon the prior appellate opinion. The petitioner argued the trial court had improperly relied upon the prior opinion because " 'an appellate opinion cannot be used to prove the circumstances of the crime.' " (*Id.* at pp. 1054–1055.) The *Soto* court stated, "We disagree that the trial court erred because, regardless of the trial court's reliance on the facts in this court's prior opinion to explain how the malice element of murder may be satisfied at Soto's trial, the jury instructions themselves demonstrate as a matter of law that Soto could not make a prima facie showing that he is entitled to relief." (*Id.* at p. 1055.)

The trial court in *Soto*, having reviewed the pleadings, the jury instructions given at trial and the prior appellate opinion, had explained its denial of the petition by reference to the facts of the offense: The court "said

---

[9] As we have said, in this case, guilt based on natural and probable consequences under a conspiracy theory would necessarily establish intent to kill on the part of each conspirator because a conspiracy to commit murder is necessarily a conspiracy to commit first degree murder. (*People v. Cortez* (1998) 18 Cal.4th 1223, 1232.) Accordingly, the changes to sections 188 and 189 made by Senate Bill No. 1437 would not alter this basis of liability.

17

it 'thought that the implied malice came from [a witness's] statement about what Soto had said' and [the witness's] statements 'satisfied the requirement or helped satisfy the requirement of malice.' " (*Soto, supra,* 51 Cal.App.5th at p. 1051.)  The trial court in the present case did not use our *Bhushan* opinion as a basis for drawing its own conclusions as to what the evidence showed.  Rather, as we have said, it relied upon our holding that the jury instructions and prosecutor's argument did not permit a conclusion that Bhushan was convicted as an aider and abettor based on a theory of natural and probable consequences.

Bhushan additionally contends the trial court erred in relying *at all* on the record of conviction and our *Bhushan* opinion in denying his petition. In doing so, the trial court relied upon *People v. Lewis* (2020) 43 Cal.App.5th 1128 (*Lewis*), review granted March 18, 2020 (S260598).  The question whether superior courts may consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under section 1170.95 is currently pending review by the California Supreme court in *Lewis* and a number of other cases.

We agree with *Lewis* and the other cases that have found it appropriate and proper to consider "the defendant's record of conviction, including documents in the court's own file and the appellate opinion resolving the defendant's direct appeal, in determining eligibility" under section 1170.95.  (E.g., *People v. Palacios* (2020) 58 Cal.App.5th 845, 856, review granted Feb. 24, 2021, S266701; *People v. Garcia* (2020) 57 Cal.App.5th 100, 110–111, review granted Feb. 10, 2020, S265692; *People v. Tarkington* (2020) 49 Cal.App.5th 892, 899, review granted Aug. 12, 2020, S263219; *People v. Law* (2020) 48 Cal.App.5th 811, 820–821; review granted July 8, 2020, S262490; *Offley, supra,* 48 Cal.App.5th at p. 597; *Verdugo,*

*supra,* 44 Cal.App.5th at pp. 330, 333; *Lewis, supra,* 43 Cal.App.5th at pp. 1137–1138.)

Bhushan urges us to reach the opposite conclusion based on canons of statutory construction, primarily the rule that " '[c]ourts should give meaning to every word of a statute if possible, and should avoid a construction making any word surplusage.' [Citation.)" (*Reno v. Baird* (1996) 18 Cal.4th 640, 658.) The single express reference to "record of conviction" in section 1170.95 is in subdivision (d), which states that at the hearing following issuance of an order to show cause, "[t]he prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens." (*Id.*, subd. (d)(3).) Bhushan argues that if the trial court is permitted to consider the record of conviction in the earlier prima facie inquiry, it would be unnecessary to mention it in subdivision (d), rendering that reference surplusage.

We disagree. Whatever questions there might be about particular uses of particular elements of the record of conviction (*People v. Cooper, supra,* 54 Cal.App.5th at p. 123 [error to deny petition based on preliminary hearing transcript prior to appointment of counsel for petitioner]; *Drayton, supra,* 47 Cal.App.5th at p. 982 [error to deny petition based on factual facts and inferences drawn from preliminary hearing transcript without issuing order to show cause and permitting evidentiary hearing]), without *any* ability to reference to the record of conviction, the trial court would be required to accept as true even allegations of a petition that the simplest review of the court's own files would show to be erroneous.[10] Section

---

[10] As other courts have noted, consideration of the record of conviction is permissible in analogous contexts, such as petitions under section 1170.18 (recall of sentence and reclassification of felony as misdemeanor) or 1170.126,

1170.95 " 'indicates the Legislature's intent that the superior court perform a substantive gatekeeping function, screening out clearly ineligible petitioners before devoting additional resources to the resentencing process' " (*People v. Edwards* (2020) 48 Cal.App.5th 666, 673 (*Edwards*), review granted July 8, 2020, S262481, quoting *Verdugo, supra,* 44 Cal.App.5th at p. 331), and "[t]o that end, 'the relevant statutory language, viewed in context, makes plain the Legislature's intent to permit the [superior] court . . . to examine readily available portions of the record of conviction to determine whether a prima facie showing has been made that the petitioner falls within the provisions of section 1170.95." (*Edwards,* at p. 673, quoting *Verdugo,* at p. 323.) Reference to the record of conviction is in essence the default source of information the trial court may consider at any stage in the proceedings. So understood, it appears to us that subdivision (d) of section 1170.95 simply makes clear that at the evidentiary hearing, the parties may choose to rely just on the record of conviction or may choose to present "new or additional evidence."

In any event, "the rule against surplusage will be applied only if it results in a *reasonable* reading of the legislation." (*Santa Clara County Local Transportation Authority v. Guardino* (1995) 11 Cal.4th 220, 234– 235.) Precluding the trial court from any consideration of the record of conviction in determining whether a petitioner has established a prima facie showing of entitlement to relief would not be reasonable. "Allowing the trial court to consider its file and the record of conviction is . . . sound policy. As a respected commentator has explained: 'It would be a gross

---

subdivision (e) (resentencing where third strike was not a serious or violent felony). (*Law, supra,* 48 Cal.App.5th at pp. 820–821; *Lewis, supra,* 43 Cal.App.5th at p. 1138.)

misuse of judicial resources to require the issuance of an order to show cause or even appointment of counsel based solely on the allegations of the petition, which frequently are erroneous, when even a cursory review of the court file would show as a matter of law that the petitioner is not eligible for relief. For example, if the petition contains sufficient summary allegations that would entitle the petitioner to relief, but a review of the court file shows the petitioner was convicted of murder without instruction or argument based on the felony murder rule or [the natural and probable consequences doctrine], . . . it would be entirely appropriate to summarily deny the petition based on petitioner's failure to establish even a prima facie basis of eligibility for resentencing.' " (*Lewis, supra,* 43 Cal.App.5th at p. 1138, quoting Couzens et al., Sentencing Cal. Crimes (The Rutter Group 2019) ¶ 23:51(H)(1), pp. 23-150 to 23-151.)"[11]

Moreover, unlike the situations in cases such as *Lewis* and *Verdugo,* the present case does not involve the court considering the record of conviction prior to appointment of counsel and briefing by the parties, or without a hearing. Bhushan was represented by counsel when he filed his petition and the court received briefs from the parties and held a hearing prior to denying the petition. We can conceive of no reason the trial court

---

[11] Bhushan also mentions the rules that "[i]f the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history" (*People v. Knowles* (1950) 35 Cal.2d 175, 183) and that "the expression of certain things in a statute necessarily involves exclusion of other things not expressed" (*People v. Brun* (1989) 212 Cal.App.3d 951, 954). To the extent these principles might apply here, suffice to say the "canons of construction are mere guides and will not be applied so as to defeat the underlying legislative intent otherwise determined." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1391.)

21

should be precluded from considering the record of conviction at this stage. (See *People v. Daniel*, *supra*, 57 Cal.App.5th at p. 677 [although trial court "may not rely on the record of conviction to deny a facially sufficient petition" prior to appointment of counsel and briefing, petitioner offered "no reason why a court would be prohibited from relying on the record of conviction to deny a petition *after* deeming it facially sufficient, appointing counsel, and receiving briefing from the parties"].)

Finally, Bhushan also argues the trial court erred in relying on "non-enumerated statutory factors" to find Bhushan failed to establish a prima facie showing of entitlement to relief. Quoting the court's statement that there was an "initial screening" to determine whether "it's a person convicted of murder under one of these two theories," Bhushan maintains the court "relied on language outside of subdivision (a)" and improperly required him to show he was convicted under a "prohibited theory." According to Bhushan, subdivision (a) of section 1170.95 requires a petitioner to show only the three factors set forth in subdivisions (a)(1), (2), and (3): that "a complaint, information or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; that "[t]he petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder"; and that "[t]he petitioner could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." Bhushan contends he cannot be required to show "the exact theory" upon which the jury relied.

22

Bhushan ignores the first sentence of subdivision (a) of section 1170.95. "A person convicted of felony murder or *murder under a natural and probable consequences theory* may file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply . . . ." (Italics added.) Subdivision (a) then continues with the three factors quoted above.

As we have observed, "[t]he first paragraph of section 1170.95, subdivision (a) sets forth the basic 'who' and 'what' of the statute—who may seek relief and what they may seek. The 'who' is '[a] person *convicted of felony murder or murder under a natural and probable consequences theory*' and the 'what' is the opportunity to 'file a petition with the court . . . *to have the petitioner's murder conviction vacated.*' " (*People v. Paige* (2020) 51 Cal.App.5th 194, 202, review den. Sept. 9, 2020.) In *Paige*, the significance of the "who" defined in this first sentence of the subdivision was that section 1170.95 does not offer relief to a person convicted of an offense other than murder—in that case, voluntary manslaughter. (*Paige,* at p. 197.) But the language of subdivision (a) modifies the "who" by specifying that it is not every person convicted of murder who is eligible for relief under section 1170.95, only a person "convicted of felony murder or murder under a natural and probable consequences theory." The trial court did not rely on language outside subdivision (a); it applied the language in subdivision (a) defining the fundamental prerequisite to relief. Bhushan's argument would excise the language "convicted of felony murder or murder under a natural and probable consequences theory" from the statute.

## DISPOSITION

The order denying the section 1170.95 petition is affirmed.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.


*People v. Bhushan* (A159917)