Filed 3/7/23  P. v. Pellecer CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B318988 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA417246) |
| v. | |
| JAVIER PELLECER, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lynne M. Hobbs, Judge.  Affirmed.

Pensanti & Associates and Louisa Belle Pensanti for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Idan Ivri and Gabriel Bradley, Deputy Attorneys General, for Plaintiff and Respondent.

_____

In 2016, a jury found defendant and appellant Javier Pellecer guilty of the first degree murder of Columbus Campbell (Campbell) (Pen. Code, § 187, subd. (a)),[1] the second degree murder of Kavette Watson (Watson) (§ 187, subd. (a)), and being an accessory after the fact to murder (§ 32). The jury found true allegations that the crimes were committed for gang purposes. (§ 186.22, subd. (b)(1).) As to the murders, the jury also found true multiple murder special circumstance allegations (§ 190.2, subd. (a)(3)) and firearm enhancement allegations (§ 12022.53, subds. (b), (c), (d) & (e)(1)). The trial court sentenced defendant to an aggregate prison term of life without the possibility of parole plus 65 years to life.

We affirmed the judgment on direct appeal. (*People v. Pellecer* (Sept. 18, 2018, B280333) [nonpub. opn.], at p. 28 (*Pellecer*).)

In 2019, defendant filed a petition for resentencing under section 1172.6 (former § 1170.95).[2] The trial court found that defendant had failed to make a prima facie showing for relief as to Campbell's murder, but the court issued an order to show cause and held an evidentiary hearing as to Watson's murder. At the conclusion of the evidentiary hearing, the court denied defendant's petition. This appeal ensued.

We affirm.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Effective June 30, 2022, section 1170.95 was renumbered section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.) For simplicity, we refer to the section by its new numbering.

# BACKGROUND

I. *Facts Underlying Convictions*[3]

    A. The murders of Campbell and Watson

At approximately 12:30 a.m., on October 6, 2008, Kimberly Ramirez (Ramirez) was talking with a man in the vicinity of 3415 West 63rd Street in Los Angeles. (*Pellecer*, *supra*, B280333, at p. 3.) Someone fired several gunshots from behind Ramirez. (*Ibid.*) "Ramirez ducked. She saw someone wearing dark clothing shoot at a parked white Mercedes Benz. The shooter then got into a dark colored 'Nissan of some sort' that was parked next to the victims' car. The Nissan then drove away." (*Ibid.*)

Campbell, a Rollin 60's Crips gang (Rollin 60's) member, had been sitting in the driver's seat of the Mercedes Benz; Watson, who was 16 years old, had been sitting in the front passenger seat. (*Pellecer*, *supra*, B280333, at pp. 3–4.) Both Campbell and Watson sustained gunshot wounds. (*Id.* at p. 4 & fns. 3–4.) Campbell died at the scene; Watson was transported to the hospital, where she later died from her injuries. (*Id.* at p. 4.)

"Los Angeles Police Department Detective Ernesto Mendoza, who was assigned to the criminal gang homicide division, responded to the crime scene. He recovered 11 .40-caliber casings from the Mercedes Benz. [¶] Detective Mendoza later determined that defendant owned a blue Nissan Altima." (*Pellecer*, *supra*, B280333, at p. 4.)

    B. Police interview of Crystal Davis (Davis)

Detective Mendoza interviewed Davis, who lived in the same neighborhood as defendant, in January 2009. (*Pellecer*, *supra*, B280333, at p. 4.) Davis said that Wayne Gray (Gray),

---

[3] We draw these facts from our prior, unpublished opinion affirming the judgment. (*Pellecer*, *supra*, B280333.)

3

with whom she had a child, was a Rollin 60's member. (*Id.* at pp. 2, 4–5.) "Davis was present when Campbell and Gray got into an argument and fight in an apartment complex in September 2008. Campbell 'blind-sided' Gray and hit him in the face; Gray suffered a cut above his eye." (*Id.* at p. 5.)[4]

C. <u>The murder of Charles Westby (Westby)</u>

"Westby was murdered on June 2, 2013, as a result of multiple gunshot wounds.

"Los Angeles Police Department Detective John Jamison arrested [Jerry] Wilson, Gray, and [Leon] Panting for the murder of Westby. Los Angeles Police Department Detective Eric Crosson told Detective Jamison that someone had assisted those men in disposing of the murder weapon." (*Pellecer*, *supra*, B280333, at pp. 2, 5.)

D. <u>Resumption of the investigation into the murders of Campbell and Watson</u>

"In 2013, Los Angeles Police Department Detectives Miguel Gutierrez and Crosson were assigned to investigate the homicides of Campbell and Watson. Detective Gutierrez requested surveillance on defendant. On October 16, 2013, defendant was detained and brought into an interview room at the police station. Detective Gutierrez also set a 'jail operation' in place, whereby a confidential informant (CI)[5] would be placed in a cell with a person that the police believe[d] committed a

---

[4] At trial, Davis denied making these statements to police. (*Pellecer*, *supra*, B280333, at p. 5, fn. 6.)

[5] "The CI was posing as a fellow inmate; he was never actually in custody." (*Pellecer*, *supra*, B280333, at p. 5, fn. 7.)

crime so that the suspect would 'talk and maybe confess about the crime.'

"Detective Gutierrez then interviewed defendant, and the interview was recorded. During the interview, Detective Gutierrez wanted to 'stimulate' defendant so that he would talk about the crime with the CI. Therefore, he told defendant that he (defendant) had loaned his car to the shooter and that his car was used in the shooting. Detective Gutierrez also told defendant about the motive that the shooter had for the shooting (a fight with the victim). And, Detective Gutierrez gave defendant a general location and date and time of the double homicide. Defendant was then placed in a jail cell with the CI." (*Pellecer*, *supra*, B280333, at pp. 5–6, fn. omitted.)

E. Defendant's recorded conversation with the CI

"The CI asked defendant what he was charged with. Defendant replied, 'The ultimate' and '187.' The CI asked defendant how long ago the crimes occurred, and defendant replied 'Five years ago.' Defendant then said that the '[s]ame motherf***er' just did some 'sh**' this year, 'in June.' Defendant continued: 'But all right like me and him did this one way back then, f*** I, I had nothing to do with this one right now.'

"Defendant and the CI then talked about defendant getting picked up after five years. The CI told defendant that the police probably had his car 'branded,' but could not put him in the vehicle. Defendant replied that he had put paper plates on the car and after he 'did the . . . job,' he put the regular plates back on.

"The CI next told defendant: 'You know what else you gotta worry about homey? Get rid of those straps. Get rid of 'em.' Defendant responded, 'All of them are gone.' Defendant

explained that he sold it to a whole other neighborhood, approximately 30 minutes away.

"As their conversation continued, defendant told the CI that his 'homeboy' called him and asked him to pick him up. The man went to defendant's car and said, "'hey man let's go do this little . . .'" and defendant went with him.

"The following exchange then occurred:

"'[DEFENDANT]:  But see when we had did the sh**, 'cause I know the little, it was this little f***in' mayate (n***er) that he got into it with right?

"'[CI]:  Yeah, yeah.

"'[DEFENDANT]:  So I . . . you know I didn't care, like "f*** it." What I didn't like afterward because there was a girl in there.

"'[CI]:  Uh.

"'[DEFENDANT]:  There was like a f***in' [16]-year old girl in there.

"'[CI]:  On in there.

"'[DEFENDANT]:  In the car with homeboy. They were like f***in' asleep like at one in the morning by a motel and sh**.

"'[CI]:  Oh so you guys rolled up on a car that was . . . .

"'[DEFENDANT]:  So, yeah, so my homey, he's like "hold on, this fool's in this motel" 'cause he [had] seen the car.

"'[CI]:  Yea . . . oh so you guys stopped?

"'[DEFENDANT]:  He stopped but then he looked in the car and he's like "this mother***er's sleeping in his car" like . . . . [¶] . . . [¶]

"'[DEFENDANT]:  But I, I didn't know that it was a girl in there asleep too. So he [had] seen her to[o] and just f***[]it let em . . . .

"'[CI]: Oh he let 'em both have it?

"'[DEFENDANT]: Yea they both . . . .

"'[CI]: Oh but you know what—you got, you got to do . . . .

"'[DEFENDANT]: That's that's pretty much it. Yeah. You gotta do what you gotta do.'

"Defendant then indicated that he did not care about the male victim, but was bothered by the fact that the second victim was a 16-year-old girl.

"The CI then asked defendant what he did when his friend jumped out of the car 'to do that.' Defendant replied, 'I just . . . I pulled up right, right next to it. He jumped out "bam, bam, bam" rolled, the light turned green. . . . There was nobody in sight man.' The CI asked where the motel was, and defendant said '[o]n 63rd and Crenshaw.'

"Next the CI asked defendant about '[t]he heat from back then.' Defendant stated that it was gone 'two days after' the shooting. Defendant then admitted that he 'got rid of this one for him too.'

"Later in the conversation, defendant indicated that the 2008 shooting was a 'target' shooting; they 'went looking for that fool' because they knew 'where his whereabouts were.'

"In Detective Gutierrez's opinion, defendant had confessed to being the driver in the 2008 double homicide. Thus, he generated a report of the jail operation and took it to the district attorney's office." (*Pellecer*, *supra*, B280333, at pp. 6–9.)

II. *Section 1172.6 Petition*

On November 4, 2019, defendant filed a petition for resentencing pursuant to section 1172.6. Following briefing and oral argument by the parties, the trial court found that defendant had failed to make a prima facie showing for relief as to the

7

murder of Campbell.[6]  As to the murder of Watson, the court issued an order to show cause.

III.  *Evidentiary Hearing*

The evidentiary hearing on defendant's petition was held on February 7 and 23, 2022.

A.  <u>The People's evidence</u>

The People submitted the trial transcripts, trial exhibits, portions of the preliminary hearing transcript, the jury instructions, the jury verdict forms, and our prior opinion affirming the judgment.

B.  <u>Defendant's evidence</u>

Defendant testified on his own behalf at the evidentiary hearing.  He also offered the transcript of the preliminary hearing testimony of Ricardo Zamora (Zamora).[7]

1.  *Defendant's testimony*

Defendant was "hanging out" in the Dorset Village apartment complex.  He left his car parked in the complex when a friend picked him up to go to dinner.  He returned to the area around 10:30 p.m. or 11:00 p.m., but he could not retrieve his car because Dorset Village was gated.  Defendant went back to his home, which was one street away.

Defendant eventually got in contact with Gray, who lived in Dorset Village.  At defendant's request, Gray delivered defendant's car to him at around midnight.  Gray asked defendant to take him to get drugs before taking him back home.

---

[6]     Because the judge who presided over defendant's trial and sentencing had retired, a different judge ruled on defendant's petition.

[7]     Zamora did not testify at defendant's trial.

8

When defendant and Gray arrived at the area where the drugs were sold, Gray exited the car and defendant got into the driver's seat. Gray returned with the drugs and got into the passenger's seat. They then drove to a liquor store to buy drinks.

After leaving the liquor store, Gray asked defendant to turn onto 63rd Street. After passing a few stop signs, Gray directed defendant to pull over into an empty parking spot. Defendant complied. Gray prepared to snort cocaine and asked defendant to pull into a motel parking lot, saying that "somebody was over there . . . he wanted to see[.]" A person then walked down the street. Gray pulled out a gun from his waistband, rolled down the window, and told the person to "'get the f*** away from here.'"

Defendant told Gray, "'Let's go.'" Gray responded, "'Hold on. Let me just—I'm just going to walk into the hotel. I'm just going to go to the hotel. Just wait for me.'" Gray exited the car and started walking down the street. Gray veered out of defendant's sight. Defendant heard gunshots and ducked. When the gunshots stopped, defendant started driving and saw Gray standing on the street waiting. Gray got into the car, and defendant drove off. Defendant asked Gray, "'What the hell just happened?'" and Gray "explained" what had occurred.

Defendant was arrested about a month later. He was questioned, polygraphed, and released the same day. Five years passed. Defendant was arrested again on October 16, 2013, and taken to a police station, where he had a conversation with a person in the lockup with him. Defendant "wasn't 100% truthful" during that conversation. The person defendant spoke to did not appear at defendant's trial.

9

Defendant did not shoot the victims, encourage Gray to do so, or know that Gray was going to do something. Defendant admitted to being a Rollin 60's member at the time. Gray was affiliated with the gang but was not a member.

2. *Zamora's preliminary hearing testimony*

Zamora testified that at around midnight on October 6, 2008, he was "[h]anging out" in the vicinity of 3415 West 63rd Street in Los Angeles. He saw a male and a female in a parked white BMW or Mercedes Benz. He also saw a dark-color car, which he had never seen in the neighborhood before, parked a few cars behind the white car. Two men were in the dark-color car. One was making "[a]ngry type gestures."

Zamora went back to his apartment but then returned to where the dark-color car was parked. He pretended to urinate so that he could see who was in the car. The front passenger side window rolled down. The man sitting in the front passenger seat pointed a gun at Zamora and said, "'Get the f*** away from me, you punk ass motherf***er, before I shoot.'" Zamora ran to a balcony close to his apartment and watched the dark-color car.

About 10 minutes later, Zamora saw a man with a pistol in his hand exit the dark-color car from the passenger side. The man walked to the white car and started shooting into the driver's side window. After the shooting stopped, the driver of the dark-color car drove up slowly with the lights off, picked up the shooter, and drove away.

IV. *Trial Court Order*

After entertaining oral argument, the trial court denied defendant's section 1172.6 petition as follows:

"[T]he court . . . finds that in the trial of this case, the People proceeded under an aider and abettor theory. That theory

10

was argued before the jury. That was the only theory given to the jury, and the jury found that the defendant was guilty based on that aider and abettor theory.

"The court also finds that substantial evidence supports that theory, as stated by the Court of Appeal. When the court considers the defendant's jailhouse conversation, the court finds that it only bolsters the Court of Appeals' conclusion, as well as the jurors' conclusion, that the defendant was an aider and abettor in the killing of Campbell. And to the extent that the defendant's testimony differs, the court finds it not credible.

"The court believes that the defendant, even if he did not have in mind to kill the 16-year-old that was present in the car, and was remorseful that it occurred—the court believes that the aider and abettor theory applies to the transferred intent doctrine as well, not because the case is stated prior to [section 1172.6], but because of the changes in the law had to do with not having the mens rea of killing, which is a high—which is one of the most heinous crimes.

"So once you reach that level of mens rea to kill one person, I believe that transferred intent would apply to an unintended target, even under an aider and abettor theory.

"And for these reasons, the court denies the [section 1172.6] petition."

V. *Appeal*

Defendant filed a timely notice of appeal from the denial of his section 1172.6 petition.

## DISCUSSION

I. *Relevant Legal Principles*

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) was enacted to "amend the felony

murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f).)

To accomplish this, Senate Bill 1437 substantively amended sections 188 and 189. (Stats. 2018, ch. 1015, §§ 2-3.) A murder conviction now "requires proof that the defendant (1) was the actual killer (who acted with the requisite express or implied malice), (2) directly aided and abetted the actual killer while acting with the intent to kill, or (3) was a major participant in a felony who acted with reckless indifference to the value of human life. (§§ 188, 189.)" (*People v. Duran* (2022) 84 Cal.App.5th 920, 927 (*Duran*).)

Thus, as relevant here, "[a]lthough an accomplice can no longer be convicted of murder under the natural and probable consequences theory, an accomplice can still be convicted of murder as a direct aider and abettor. [Citations.]" (*People v. Pacheco* (2022) 76 Cal.App.5th 118, 124 (*Pacheco*), review granted May 18, 2022, S274102; see also *People v. Gentile* (2020) 10 Cal.5th 830, 848 (*Gentile*) ["Senate Bill 1437 does not eliminate direct aiding and abetting liability for murder because a direct aider and abettor to murder must possess malice aforethought"].) "Under a direct aider and abettor liability theory, the prosecution must prove the person who is not the actual killer 'engaged in the requisite acts and had the requisite intent' to aid and abet the target crime of murder. [Citation.] A direct aider and abettor's 'guilt is based on a combination of the

12

direct perpetrator's acts and the aider and abettor's *own* acts and *own* mental state.' [Citation.]" (*Pacheco, supra,* at p. 124.)

Senate Bill 1437 also added what is now section 1172.6. (*People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).) "While the amendments to sections 188 and 189 narrow the elements of murder prospectively, section 1172.6 is the statutory mechanism for determining whether to *retroactively* vacate a final murder, attempted murder, or manslaughter conviction that does not comply with the new, narrower definitions." (*Duran, supra,* 84 Cal.App.5th at p. 927.)

To seek relief under section 1172.6, a defendant "must 'file a petition' alleging entitlement to relief along with '[a] declaration' attesting to eligibility for relief. [Citation.]" (*Duran, supra,* 84 Cal.App.5th at p. 927.) "When the trial court receives a petition containing the necessary declaration and other required information, the court must evaluate the petition 'to determine whether the petitioner has made a prima facie case for relief.' [Citations.] If the petition and record in the case establish conclusively that the defendant is ineligible for relief, the trial court may dismiss the petition. [Citations.]" (*Strong, supra,* 13 Cal.5th at p. 708.)[8]

"If the defendant 'makes a prima facie showing' of entitlement to relief (that is, if the record of conviction does not establish ineligibility for relief as a matter of law), then the [trial]

---

[8] The record of conviction, which the trial court may rely on in determining whether a prima facie showing is made (*People v. Lewis* (2021) 11 Cal.5th 952, 970–971), "may include the underlying facts as presented in an appellate opinion, the trial evidence, the jury instructions, and closing arguments of counsel" (*People v. Lopez* (2022) 78 Cal.App.5th 1, 13).

13

court must in most cases convene an evidentiary hearing where the People bear the burden of establishing beyond a reasonable doubt that the defendant is guilty of the pertinent crime under the new, narrower definitions. [Citation.] At that evidentiary hearing, the court may consider 'evidence previously admitted at any prior hearing or trial' that is admissible under current law, as well as 'new or additional evidence' that is admissible under current law. [Citation.] If the People 'fails to sustain its burden of proof' at the evidentiary hearing, *then* the conviction must be 'vacated' and the defendant resentenced. [Citation.]" (*Duran*, *supra*, 84 Cal.App.5th at p. 927.)

II. *The Trial Court Properly Denied the Section 1172.6 Petition as to the Murder of Campbell at the Prima Facie Stage*

Based on our de novo review (*People v. Coley* (2022) 77 Cal.App.5th 539, 545), we conclude that the trial court properly denied defendant's section 1172.6 petition as to Campbell's murder at the prima facie stage, without issuing an order to show cause.

The jury found defendant guilty of the first degree murder of Campbell after having been instructed on, as relevant here, malice murder (CALCRIM No. 520), first degree murder (CALCRIM No. 521), and direct aiding and abetting liability (CALCRIM Nos. 400–401). The jury was instructed that defendant was guilty of first degree murder if the People proved beyond a reasonable doubt that defendant "acted willfully, deliberately, and with premeditation." Defendant acted "willfully" if he "intended to kill." The jury was not instructed on

14

felony murder.  Nor was the jury instructed on the doctrine of natural and probable consequences as to Campbell's murder.[9]

Given these instructions, the record of conviction demonstrates that the jury necessarily found that defendant was a direct aider and abettor who acted with the intent to kill Campbell.  Defendant is therefore ineligible for relief under section 1172.6 as to Campbell's murder as a matter of law.  (See *People v. Cortes* (2022) 75 Cal.App.5th 198, 205 [the defendant failed to make a prima facie showing of entitlement to section 1172.6 relief because "the jury was not instructed on any theory of liability for murder or attempted murder that required that malice be imputed to him"]; *People v. Estrada* (2022) 77 Cal.App.5th 941, 945–949 [the defendant was ineligible for section 1176.2 relief because the jury instructions showed that he was convicted as a direct aider and abettor to first degree murder]; *People v. Daniel* (2020) 57 Cal.App.5th 666, 677 [the defendant was ineligible for section 1172.6 relief as a matter of law because the jury was not instructed on felony murder or the natural and probable consequences doctrine], review granted Feb. 24, 2021, S266336, review dism. Dec. 1, 2021.)

III.  *Substantial Evidence Supports the Finding that Defendant Was Guilty of the Murder of Watson Under a Still-Valid Theory*

We review for substantial evidence the trial court's finding that defendant was guilty of Watson's murder under a still-valid theory of murder liability.  (*People v. Vargas* (2022) 84 Cal.App.5th 943, 951.)  "Under this familiar standard, "'we review the entire record in the light most favorable to the

---

[9]	The jury was instructed on the doctrine of natural and probable consequences (CALCRIM No. 402) as to the murder of Watson only.

judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" [Citations.]" (*Ibid.*)

The trial court denied defendant's section 1172.6 petition as to Watson's murder following the evidentiary hearing because it found that defendant was a direct aider and abettor to the murder under the doctrine of transferred intent. "'Under the classic formulation of California's common law doctrine of transferred intent, a defendant who shoots with the intent to kill a certain person and hits a bystander instead is subject to the same criminal liability that would have been imposed had "'the fatal blow reached the person for whom intended.'" [Citation.] In such a factual setting, the defendant is deemed as culpable as if he had accomplished what he set out to do.' [Citation.]" (*People v. Bland* (2002) 28 Cal.4th 313, 320–321 (*Bland*).) Even when the intended victim is killed, the doctrine of transferred intent can apply to the killing of an unintended victim. (*Id.* at p. 326 ["Intent to kill transfers to an unintended homicide victim even if the intended target is killed"].) A direct aider and abettor who shares the actual killer's intent to kill the intended victim may also be convicted of the murder of an unintended victim under the doctrine of transferred intent. (*People v. Vasquez* (2016) 246 Cal.App.4th 1019, 1024–1026.) This remains a valid theory of

16

murder liability, as "Senate Bill 1437 d[id] not eliminate direct aiding and abetting liability for murder . . . ." (*Gentile*, *supra*, 10 Cal.5th at p. 848.)

As we previously concluded in affirming the judgment on direct appeal, "[a]mple evidence provided that defendant had the intent to kill Campbell based on his role in aiding and abetting Gray in the execution killing of Campbell. [Citation.] He so admitted to the CI—defendant and Gray targeted Campbell. After switching his license plates, defendant drove Gray to where they believed Campbell was. He picked Gray up after he shot the victims." (*Pellecer*, *supra*, B280333, at p. 12.) The trial court was entitled to disbelieve defendant's contrary testimony at the evidentiary hearing that he did not know that Gray would do anything. (*People v. Maury* (2003) 30 Cal.4th 342, 403 ["it is the exclusive province of the . . . [factfinder] to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends"].)

The evidence also shows that Watson was killed when, directly aided and abetted by defendant, Gray fired at least 11 shots into the car occupied by both Campbell and Watson. Even if defendant did not know that Watson was in the car, defendant's intent to kill Campbell (the intended victim) transferred to Watson (the unintended victim). (See *Bland*, *supra*, 28 Cal.4th at p. 322 ["[A] person's intent to kill the intended target is not 'used up' once it is employed to convict the person of murdering that target. It can also be used to convict of the murder of others the person also killed"].)

Accordingly, substantial evidence supports the finding that defendant was guilty of Watson's murder under a theory unaffected by Senate Bill 1437.

IV. *Defendant's Contentions*

Urging reversal, defendant raises a variety of arguments. We find each unpersuasive.

A. <u>Right to confront the CI</u>

Defendant contends that the admission of his conversation with the CI violated his Sixth Amendment right to confront witnesses because the CI was not present at the trial.[10]

At the section 1172.6 evidentiary hearing, the trial court could properly consider evidence, like defendant's conversation with the CI, that was previously admitted at his trial, provided that the evidence was still admissible under current law. (§ 1172.6, subd. (d)(3); *Duran, supra*, 84 Cal.App.5th at p. 927.) On direct appeal, we rejected defendant's challenge to the admission of that conversation, concluding that, under *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*), "there were no constitutional violations." (*Pellecer, supra*, B280333, at pp. 19–20.)[11] Defendant points to no change of law that has subsequently rendered the conversation inadmissible under current law.

---

[10] The People contend that, by failing to object at the evidentiary hearing, defendant has forfeited the argument that the trial court erred by considering defendant's conversation with the CI. Defendant's counsel did, however, argue that defendant "was not given a full and fair opportunity to cross-examine . . . [the CI] at trial." We find this sufficient to preserve the issue for appeal.

[11] In *Perkins*, the United States Supreme Court held "that an undercover law enforcement officer posing as a fellow inmate need not give *Miranda* [*v. Arizona* (1966) 384 U.S. 436] warnings to an incarcerated suspect before asking questions that may elicit an incriminating response." (*Perkins, supra*, 496 U.S. at p. 300.)

In any event, the admission of defendant's conversation with the CI did not implicate the Sixth Amendment's confrontation clause, which "provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" (*Crawford v. Washington* (2004) 541 U.S. 36, 42.) "[O]nly hearsay statements that are 'testimonial' are subject to the confrontation clause. [Citations.]" (*People v. Fayed* (2020) 9 Cal.5th 147, 168 (*Fayed*).) "The admission of *nonhearsay* statements, it follows, 'raises no Confrontation Clause concerns.' [Citations.]" (*Ibid.*; see also *Michigan v. Bryant* (2011) 562 U.S. 344, 368, fn. 11 (*Bryant*) ["the Confrontation Clause is not implicated when statements are offered 'for purposes other than establishing the truth of the matter asserted[]'"].)

Here, the CI's out-of-court statements made during his recorded conversation with defendant were not offered for the truth of the matters asserted. (Cf. *Bryant*, *supra*, 562 U.S. at p. 368, fn. 11 ["An interrogator's questions, unlike a declarant's answers, do not assert the truth of any matter"].) Rather, the CI's "statements were nonhearsay and admissible to put defendant's 'admissions on the tape[] into context, making the admissions intelligible for the jury. Statements providing context for other admissible statements are not hearsay because they are not offered for their truth.' [Citation.]" (*Fayed*, *supra*, 9 Cal.5th at p. 169.) As nonhearsay, no confrontation clause concerns arose. (*Bryant*, *supra*, at p. 368, fn. 11; *Fayed*, *supra*, at p. 168.)[12]

---

[12]  In the section of defendant's opening brief regarding the Sixth Amendment's confrontation clause, defendant recites section 4001.1, subdivision (b)'s provision that "[n]o law enforcement agency and no in-custody informant acting as an

19

B. Trial court's credibility determination

Defendant also argues that the trial court's finding that his testimony was not credible "should not be a factor in determining whether [d]efendant c[ould] make a prima facie showing for relief."

Certainly, in conducting its prima facie review of a section 1172.6 petition, "[t]he [trial] court may consider the record of conviction, but it must not engage in factfinding, weigh the evidence, or reject the petition's allegations on the basis of adverse credibility determinations.  [Citation.]" (*People v. Jenkins* (2021) 70 Cal.App.5th 924, 932.)  Contrary to defendant's intimation, the court here *did not* reject defendant's petition at the prima facie stage based on an adverse credibility determination.  The court denied the petition as to Campbell's murder at the prima facie stage because, having been convicted as a direct aider and abettor, defendant was ineligible for relief as a matter of law.  The court could properly make and rely upon its credibility determination following defendant's testimony at the section 1172.6 evidentiary hearing as to Watson's murder. (See *Guardianship of Saul H.* (2022) 13 Cal.5th 827, 846 ["if a court holds an evidentiary hearing, it may make credibility

_____

agent for the agency, may take some action, beyond merely listening to statements of a defendant, that is deliberately designed to elicit incriminating remarks."  Section 4001.1, subdivision (b), is inapposite.  It is inapplicable to incriminating statements pertaining to uncharged offenses to which the Sixth Amendment right to counsel has not yet attached.  (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 78.)  Here, defendant's conversation with the CI occurred before he was charged in this case.

20

determinations, to which an appellate court would generally defer"].)

C. Consideration of motion for mistrial and direct appellate opinion

Defendant asserts that the trial court erroneously "based its decision" to deny his section 1172.6 petition "on the denial of his motion for mistrial and appeal of the verdict" given that "[t]he standards of review are different." However, without any developed argument or citation to the record, this contention is not cognizable. (See *People v. Stanley* (1995) 10 Cal.4th 764, 793; *People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19, abrogated in part on other grounds by *People v. Griffin* (2004) 33 Cal.4th 536, 555, fn. 5; *People v. Clements* (2022) 75 Cal.App.5th 276, 292–293 (*Clements*) [where the defendant failed to "identif[y] any portion of [the] prior [appellate] opinion that the trial judge relied upon" in denying a section 1172.6 petition, the defendant had "provided no basis for overturning the trial judge's ruling on the ground that it reached its ultimate conclusion that she was not entitled to relief based on information in [the] prior opinion rather than information in the trial transcripts the parties submitted for the trial court's decisions"].) Furthermore, we have not located any mention by the court of defendant's motion for mistrial or new trial in connection with its decision on the section 1172.6 petition.

D. Consideration of Zamora's preliminary hearing testimony

We reject defendant's contention that the trial court should have considered Zamora's preliminary hearing testmony for the simple reason that the transcript of the testimony *was* admitted at the section 1172.6 evidentiary hearing and *was* reviewed by the court.

21

E.  Presiding judge

Defendant's final argument is that his "interest in a full and fair hearing was not best served" because the judge who presided over his trial did not preside over the hearing on his section 1172.6 petition.

We find no ground for reversal.  Section 1172.6, subdivision (b)(1), provides:  "If the judge that originally sentenced the petitioner is not available to resentence the petitioner, the presiding judge shall designate another judge to rule on the petition."  (See also *People v. Santos* (2020) 53 Cal.App.5th 467, 474–475.)  Here, the judge who had presided over defendant's trial and sentencing had retired from the superior court and was therefore unavailable.  (Cf. *People v. Rodriguez* (2016) 1 Cal.5th 676, 693 [explaining that "[t]he ineluctable realities of life sometimes mean that the judge designated by statute to hear a suppression motion has died, *retired*, resigned, or lacks the capacity to undertake his or her duty" (italics added)].)  While "mak[ing] factual determinations on a cold record" is "not the ideal position for a fact finder, it *is* possible to review a trial transcript and reach an opinion about what actually happened."  (*Clements*, *supra*, 75 Cal.App.5th at p. 297.)  In the context of section 1172.6, "[t]he Legislature landed on that compromise as a way of extending the ameliorative benefits of its redefinition of murder to people previously convicted under prior law, which they judged to be too harsh."  (*Clements*, *supra*, at p. 297.)

22

# DISPOSITION

The order denying defendant's section 1172.6 petition is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, Acting P. J.
ASHMANN-GERST


We concur:


_____, J.
CHAVEZ


_____, J.
HOFFSTADT